N. G. BURNHAM, APPELLANT, v. JESSE R. JACKSON, APPELLEE.

1. CONTRACT AND RESPONSIBILITY OF A PHYSICIAN.—When a physician undertakes to treat a patient for a disease or malady an implied contract arises between him and his patient, that he is possessed of the ordinary knowledge and skill of members of his profession, and that he will use his best judgment and skill in deciding upon the nature of the disease, the best mode of treatment, and that he will at all times use reasonable and ordinary care and diligence in the treatment of the case. A physician is not responsible for want

of success in his treatment, unless the same results from want of ordinary care, or ordinary skill and judgment.

2. MALPRACTICE—EVIDENCE NECESSARY TO SUSTAIN.—To render a physician liable in an action for damages for malpractice, the patient should prove that the injury complained of resulted from bad treatment, and that this result might have been foreseen and avoided by a competent practitioner. It is only where a physician has set aside established practice, and neglected to employ means which are universally held to be necessary in a given case, that a charge of malpractice can be sustained.

3. INSTRUCTIONS SHOULD BE BASED ON THE LAW AND THE EVIDENCE.—An instruction to the effect that the interests of society require that physicians be held to a strict rule of accountability is objectionable, as going outside the record, and tending to influence the jury by a reference to matters not proper for their consideration.

4. ERROR TO ASSUME FACTS NOT ESTABLISHED.—An instruction is erroneous which assumes as a conclusion, and without testimony satisfactorily establishing the fact, that a certain condition of the diseased organ of the patient existed at the time the defendant took charge of the case, and during the interval he remained in charge.

5. HOW FAR PHYSICIANS BOUND BY ESTABLISHED PRACTICE.—An instruction—"that if writers on the treatment of *phimosis*, or practical surgeons, prescribe a mode of treatment, it is incumbent on surgeons called on to treat such an ailment to conform to the system of treatment thus established, and if they depart from it they do so at their peril," does not state the law correctly. Physicians are bound by what is universally settled in the profession; not by what some writers and practical surgeons recommend. And the mere fact that writers or practical surgeons prescribe a certain mode of treatment does not make it incumbent on a surgeon called to treat an ailment to conform to such mode of treatment.

*Appeal from District Court of Arapahoe County.*

ACTION by Jesse R. Jackson against N. G. Burnham for damages for malpractice. Judgment for plaintiff, a new trial denied, and defendant appeals.

Messrs. J. A. BENTLEY, WOLCOTT & VAILE, and H. F. MAY, for appellant.

Messrs. WYCOFF & BRIERLY, for appellee.

RICHMOND, P. J. This is an action for malpractice in

which the plaintiff had a verdict in the sum of $5,000. For the better understanding of the case, it becomes necessary to quote extensively from the complaint. The complaint alleges that on the 5th January, 1890, the defendant holding himself out as competent and being then a physician located and practicing in the city of Denver, county and state aforesaid, this plaintiff, by agreement with the defendant, and at the defendant's request, employed the defendant as such physician, for reward and recompense, to attend on and administer medicines to and endeavor to cure this plaintiff of a malady from which he then suffered; that the defendant entered upon such employment, and undertook, as a physician and surgeon, to administer medicines and treat this plaintiff, and cure him of his said malady, and continued so to do from time to time, and that it thus became the duty of the said defendant, as a physician, to exercise reasonable care and skill in said treatment of this plaintiff, and to avoid acts in their nature dangerous to the life, limb, or health of this plaintiff; that said defendant did not use reasonable, ordinary, due, and proper care or skill in his treatment of this plaintiff, and in delivering said plaintiff of his said malady, in this: that this plaintiff being afflicted with *phimosis*, or an adherence of the prepuce or foreskin of the *penis* to the head thereof, and a consequent swelling thereof, the said defendant, instead of slitting up the prepuce or foreskin to the *corona*, and thus liberating the glands of the *penis*, and allowing circulation, and using other appliances and remedies, as is the reasonable, usual, and ordinary method adopted by the profession in such cases as this to prevent gangrene and sloughing, wrongfully, negligently, and unskilfully applied and directed to be applied and kept, on the *penis* of this plaintiff, a flaxseed meal poultice, which application, under the circumstances and in the condition of plaintiff's malady, aggravated said malady, and accelerated the condition of gangrene and sloughing which followed, and which might have been prevented by proper treatment; and that the said defendant wrongfully, negligently, and unskilfully

treated this plaintiff, and wrongfully, negligently, and un-
skilfully neglected to use the proper and ordinary means and
care, whereby this plaintiff's member aforesaid might have
been saved and cured or relieved; that by reason of the pre-
mises plaintiff has been damaged in the sum of $20,000.

To this complaint defendant, Burnham, filed his answer,
admitting that he was a practicing physician, and that he
was called to attend upon and administer medicines to the
plaintiff, but denies generally each and every other material
allegation contained in the complaint.

Upon the issue thus presented by the pleadings a trial
was had, and resulted in a verdict in the sum of $5,000 for
plaintiff. Thereafter the usual motion for new trial was in-
terposed and overruled, and judgment entered upon the ver-
dict. To reverse this judgment defendant prosecutes this
appeal.

Twenty-eight errors are assigned for reversing the judg-
ment and allowing a new trial. They are directed to the ac-
tion of the court in permitting evidence to be given over the
objections of defendant, and in refusing to give instructions
asked by the defendant, as well as to the instructions given.

It will be well to observe, in the first place, that by this
complaint there is no allegation that the defendant, Burnham,
was not a physician properly educated and qualified, and that
the claim for damages is that the injuries resulted from his
negligence and unskilful treatment. Much testimony was
taken on the part of the plaintiff which in effect established
that, after a brief treatment of the plaintiff by the defendant,
Burnham, he was discharged, and a period of thirty-six hours
intervened before another physician was called in. At the
time the second physician was called and examined the organ
he hesitated about undertaking the case, and finally concluded
that he would not without additional assistance. Additional
assistance being provided, it was deemed the proper thing to
slit the prepuce. This was on Wednesday, and not until
the Saturday or Sunday following were the physicians satis-
fied that gangrene had set in. Being so satisfied, they de-

termined upon amputation.   Two or three amputations were performed, the last resulting in the complete disappearance of the organ.   Dr. Burnham was called for the purpose of treating the plaintiff for chills and fever, and incidentally his attention was directed to the condition of the organ of the plaintiff, and the unquestioned testimony of all the witnesses is that the organ at that time presented a swollen and filthy condition, and that it was in fact very much inflamed. Dr. Burnham then prescribed internal and external remedies and subsequently prescribed a flaxseed meal poultice, mixed with certain kinds of oil and charcoal.

It may be well at this time to comment upon the nature of the contract between plaintiff and defendant.   " The law requires and implies, as a part of the contract, that when a physician undertakes professional charge of a patient he will use reasonable and ordinary care and diligence in the treatment of the case.   The law further implies that he agrees to use his best skill and judgment at all times in deciding upon the nature of the disease, and the best mode of treatment, and the management generally of the patient.   The essence of the contract is that he is to do his best, to yield to the use and service of his patient his best knowledge, skill, and judgment, with faithful attention by day and night, as reasonably required.   There are some things, however, that the law does not imply or require.   He is not responsible for want of success in his treatment, unless it is proved to result from want of ordinary care or ordinary skill or judgment. He is not a warranter of a cure, unless he makes a special contract to that effect.   If he is shown to possess the qualifications stated in the first proposition to authorize and justify him in offering his service as a physician, then if he exercises his best skill and judgment, with care and careful observation of the case, he is not responsible for an honest mistake of the nature of the disease, or as to the best mode of treatment, when there was reasonable ground for doubt or uncertainty."

The above is a quotation from the case of *Patten v. Wig-*

*gin*, 51 Me. 596; and a careful examination of all the authorities, I may say, from the earliest to the latest, will conclusively establish this to be the nature of a contract entered into by a physician and the party calling him; and under this rule we can safely say that it is admitted by the plaintiff that Dr. Burnham possessed all of the qualifications, as a physician or surgeon, the law requires. In other words, he was possessed of that reasonable degree of learning, skill, and experience which is ordinarily possessed by others of his profession who are in good standing as to qualifications, and which reasonably qualify him to undertake the care of a patient. *Vide Pettigrew v. Lewis*, (Kan.) 26 Pac. Rep. 458.

"Where there is a difference of opinion among practical and skilful surgeons as to the practice to be pursued in a certain class of cases, a surgeon may exercise his own best judgment, and employ such treatment as experience has shown him to be best; and a mere error of judgment as to that would not, under the law, make him liable in damages for an injury resulting to his patient." *Vanhooser v. Berghoff*, 90 Mo. 488. This being so, it becomes necessary to refer briefly to the testimony of some of the witnesses.

Dr. Burnham himself testifies that he was called upon to attend the plaintiff, and found him in a high fever; that he complained of more or less pain through his chest, of looseness of the bowels, and that subsequently, after prescribing for those ailments, his attention was called to the plaintiff's *penis;* that he examined the organ, and found it in a filthy condition, both in appearance and in odor, and that he prescribed at the time for a local trouble; that he asked the plaintiff how long it had been troubling him, and the plaint-replied, "Several days." Defendant further asked him how it became poisoned—"Have you had connection with an impure woman, or been abusing yourself?" That he could not give an intelligent reply to questions. After further reference to the condition of the organ, he concluded that possibly there might be an ulceration, and, getting as much information from the young man as he could, he prescribed

antiseptics and disinfecting agents for cleansing the putrid condition of the organ; that he desired to have it cleansed; that the swelling was not confined to the head of the organ, and that there was no apparent constriction of the glands below the prepuce; that there was no bulging up of the glands indicating constriction; and that the organ was inflamed from the prepuce back to the body. He further states that he has treated *phimosis;* that it is a simple operation, and a safe one, where the parties are in good condition. In this case he says: " I found a condition of poison, that is, of tensiveness, and of more or less discharge, that to have meddled with it in a surgical way would probably have infected whatever cut I might have made, and would have aggravated and complicated the whole case." That next morning he saw the patient, and found the offensive odor still; that he, in a sharp way, directed him to keep the organ clean; that he then ordered a continuance of the disinfecting solution, to keep it enveloped and wrapped, so as to allay inflammation, and to prevent the odor that attached to it. This seemingly was the condition in which Dr. Burnham found and left the patient. From thirty-two to thirty-six hours thereafter another physician was called in, who then found a condition of affairs altogether different from that testified to by Dr. Burnham. This was Dr. P. D. Rothwell. He testifies that upon an examination he concluded that the patient was suffering with congenital *phimosis*, which disease he describes to be a condition in which the foreskin does not go back, and it very often adheres to the gland of the *penis*, and will not go back, except the person is circumcised, and it is put back; and a surgeon has very frequently to tear the outer skin outside loose from the head, and put it back by force. After deciding what the disease was, and the condition of the organ, the doctor concluded that he would require a consulting physician, and thereafter Dr. Craig was selected. From the testimony of both these physicians, it appears that the organ was dead, although it was necessary for them to perform an operation before thoroughly satisfy-

ing themselves of this fact, and that four days thereafter they found it necessary to perform two or more amputations of the organ in order to save the plaintiff's life.

Resuming consideration of the complaint : It states that the unskilfulness and neglect of the defendant " was, instead of slitting up the prepuce or foreskin to the *corona*, and using other appliances and remedies, as is the reasonable, usual, and ordinary method adopted by the profession in such cases, that he wrongfully, negligently, and unskilfully applied and directed to be applied and kept on the *penis* of this plaintiff a flaxseed meal poultice, which application, under the circumstances and in the condition of plaintiff's malady, aggravated said malady, and accelerated said condition of gangrene." There is not an atom of testimony in the entire record that satisfactorily establishes this part of the complaint, that the application of the flaxseed meal poultice accelerated the gangrene. There is no proof that at the time Dr. Burnham had the patient in charge and was treating his particular malady gangrene had set in, although Dr. Burnham honestly admitted that he was fearful that such was the condition. But in this connection, and considering the above paragraph of the complaint, attention is called to the testimony of Dr. Rothwell, who testifies that, after cutting or slitting, he dressed it antiseptically, wrapped it in cotton to keep it warm, and directed the plaintiff to use gentle friction, and used friction himself, as far as he could, to restore circulation. "I did not poultice, because I thought it had been poulticed sufficient already, and perhaps another poultice would make the parts soggy instead of aiding circulation." Dr. Craig, another witness on the part of the plaintiff, testified that "if I treated the constriction from the increasing inflammation, I should liberate the gland by incising the contracted foreskin, and use antiseptics to prevent the parts decomposing." He says : "Frequently they complete the case by circumcision. Circumcision, or incision, in a healthy person, is not a dangerous procedure." He further says that subsequently it was found necessary to amputate the mem-

ber.: Let it be borne in mind that the testimony also dis-
closes the fact to be that the plaintiff in this case was a
colored man, and that Dr. Craig. testified that it is easier to
detect the presence of a gangrenous condition in a white
limb than in one of color, and, in giving his opinion as to
whether the *penis* could have been saved by circumcision or
incision, he says : " From the condition of the person at my
first visit, my opinion was that there was a time when liber-
ation of this compression or constriction would have pre-
vented gangrene of the glands in the body." The testimony
discloses that circumcision had been performed many years
before.

Dr. Darnell, another witness for the plaintiff, testified as
an expert, but his testimony in no way seems to bear upon
the issue as presented by the pleadings.

Dr. C. N. Hart, who testified on behalf of the defendant,
and was present in court, and heard the testimony of Dr.
Burnham, indicated that his treatment would be altogether
different from that of any of the physicians, and even of Dr.
Burnham.    Dr. N. K. Morris rather supports the treatment
of Dr. Burnham.    Dr. Joseph E. Kinley also bears testimony
in favor of defendant's treatment.    Dr. J. W. Huffaker tes-
tified that it would not be good practice to slit up the prepuce
in a state of inflammation.    Dr. William L. Brett supports
the treatment of Dr. Burnham.    All of the witnesses called
on behalf of the defendant had submitted to them questions
involving the condition of the organ at the time Dr. Burnham
was first called and during his treatment.

With these observations and review of the testimony, we
come now to the consideration of the instructions, and I
shall not take them up in the order as presented by the as-
signment of errors, nor do I think it necessary to consider
all the errors assigned.

The first instruction to which attention is called is as fol-
lows : " If you find from the evidence that this defendant, in
the treatment of the plaintiff, omitted the ordinary or estab-
lished mode of treatment, and pursued one that has proven

injurious, it is of no consequence how much skill he may have. He has demonstrated a want of it in the treatment of the particular case, and is liable in damages." This instruction is certainly not warranted by the pleadings, nor am I able to find in the record evidence tending to establish the fact to be that Dr. Burnham, during the time he had charge of the patient, omitted the ordinary or established mode of treatment, or pursued one that proved injurious. It is admitted all through in the pleadings and in the evidence that defendant, Burnham, possessed the knowledge and skill to attend upon the plaintiff, and it is only claimed that he neglected and unskilfully treated the plaintiff; and for the court to state positively to the jury that his treatment, if he departed from the ordinary and established mode of treatment, demonstrated to the jury that he exhibited a want of skill, is, in my judgment, going too far. It certainly must have had its influence upon the jury. To charge a physician or surgeon with damages on the ground of unskilful or negligent treatment of his patient, the prosecution must show (1) that the injury to the health or body resulted from bad treatment; (2) that the evil result might have been foreseen and avoided by a competent practitioner. Malpractice can only be affirmed where a physician has set aside established practice, and neglected to employ means which are universally held to be necessary in a given case. But, before the physician can be reckoned guilty of malpractice on account of such deviation, it must be established (1) that the following of the rules prescribed by medical science for the curing of the disease never proves detrimental; (2) that there is at least the greatest probability that the following of the rules will accomplish the desired end; and (3) that the great majority of medical authorities have approved the rules. The position now generally accepted is that a physician is not responsible for damages, if he acts in accordance with the views of his particular school. His patient employs him as belonging to such school. See *Patten v. Wiggin, supra.*

There is no proof that satisfactorily shows that circumcis-

ion, incision, slitting of the prepuce, or any other surgical operation was necessary and proper at the time when the case was taken from the hands of Dr. Burnham. The uncertainty of the law is almost proverbial. Probably that of the medical profession is not less so. Many schools among them entertain different, and almost irreconcilable, theories as to the nature and mode of treatment of diseases. Among all these, it seems to be conceded that the character and symptoms of diseases vary in persons of different ages, sexes, and habits of life, and of different natural or acquired constitutions; and that the treatment of diseases must be more or less varied with the changes of climate and seasons, and with the peculiarities of places and persons; and that cases of sickness and circumstances apparently similar may yet be rendered substantially different by seemingly slight circumstances, easily overlooked, and otherwise difficult of detection. This being so, the circumstances which may surround the medical or surgical practitioner, and the errors or mistakes to which he is unavoidably exposed, furnish a startling explanation of unavoidable results where a jury are satisfied of the reasonable skill, diligence, attention, and care of the patient.

Instruction No. 15 is in the following language : " If the jury find from the evidence that, through the negligence of the defendant, gangrene attacked the plaintiff, and necessitated the amputation of the organ, or if you find that gangrene had set in upon the first visit of the defendant, yet he neglected to take the proper and ordinary measures to prevent its progress, and thus necessitated amputation, or greater amputation than would otherwise have been necessary, he is liable in damages."

This instruction is error, because it assumes that at the time Dr. Burnham was called, and during the time he was in attendance, gangrene had set in. There is not, from the beginning to the end of this entire record, any testimony satisfactorily establishing that fact, and it was a conclusion

of the court, wholly unwarranted, in my opinion, by the evidence.

Instruction No. 21, it strikes me, is decidedly objectionable: "It is important to the interests of society that the profession entrusted with the preservation of the health and lives of the community should be held to a strict rule of accountability." It occurs to me that this is going outside of the record; that it is referring to matters which should not have been called to the attention of a jury, and thereby influencing their judgment against the defendant. Society had no direct or indirect interest in the result of the jury's deliberations. It was purely a question between the plaintiff and the defendant, under the contract of patient and physician,—a question of whether or not defendant was skilful and diligent and faithful in his treatment of the plaintiff during the time he was permitted to attend him. Why, then, should the interest of society be called in to support the charge made in the complaint? We will admit that the declaration of the court is a true one,—that society is interested, and that the profession entrusted with the preservation of the health and lives of the community should be held to a strict rule of accountability. But what is that rule? That rule, as laid down in the books and by every authority that I have been able to discover, is that the law does not require the highest degree of skill in physicians and surgeons, but that they undertake to bring to their aid the ordinary care and skill of those engaged in the profession, and to treat their patients with ordinary care and skill, and to the best of their judgment. *Carpenter v. Blake*, 75 N. Y. 12; *Craig v. Chambers*, 17 Ohio 253; *Vanhooser v. Berghoff*, 90 Mo. 487 ; *Pettigrew v. Lewis*, *supra*.

Instruction No. 22 is in the following language : " That if writers on the treatment of *phimosis* or practical surgeons prescribe a mode of treatment, it is incumbent on surgeons called on to treat such ailment to conform to the system of treatment thus established, and if they depart from it they do so at their peril."

Physicians are bound by what is universally settled in the profession, not by what some writers and practical surgeons recommend. Other writers and other surgeons may adopt other modes, and when there is room for doubt or choice, as surgeons or physicians, they must exercise their judgment, and are not responsible for mistakes honestly made. If this last instruction can be sustained, then the further progress in surgery is absolutely prohibited by judicial decision, and I venture to say that writers of the present day on surgery widely differ in the treatment and practice from writers of ten or fifteen years ago; at least, if this be not true, then the science of surgery has not progressed to such an extent as a non-professional man, reader and thinker is led to believe it has. And in the examination of this particular case I have taken upon myself the trouble to examine medical works with reference to the particular disease *phimosis*. In the International Encyclopedia of Surgery there are at least several modes of treating this particular disease laid down. Caution under some circumstances is advised. Circumcision under certain circumstances is recommended, and under others not. Volume 5 of the Reference Hand-Books of the Medical Science supports this assertion. " Great room for difference of opinion is left in the exercise of the art of surgery, as there are usually several ways of doing the same thing ; different operations for the treatment of injuries, each operator having a partiality for a mode of dressing that has been successful in his own or his preceptor's practice." Such is the language used by the author in Elwell on Malpractice and Medical Evidence. Physicians are not responsible for the errors of an enlightened judgment, where good judgments may differ ; and I can come to no other conclusion than that, when there are reasonable grounds for doubt and difference of opinion, the professional man, after the exercise of his best judgment, admitting that he possesses the necessary knowledge, is not responsible for errors of judgment or mistakes, and is only chargeable with error where such error could not have arisen except from want of or the exer-

cise of reasonable skill and diligence. We think, therefore, there was error in this instruction, and that it had a tendency to mislead the jury.

Other errors are assigned upon the charge of the court as given to the jury, but we are inclined to think they are without foundation. For the errors pointed out the judgment must be reversed, and a new trial granted.

*Reversed.*