LORENZ STALOCH v. PETER F. HOLM and Another.[1]

March 8, 1907.

Nos. 15,013—(176).

**Malpractice.**

In an action for malpractice, a claim of operation without consent is eliminated by the charge of the court that the sole basis of the recovery of damages is the alleged negligence of the physician, to which the plaintiff made no objection and took no exception.

**Negligence of Surgeon.**

The negligence of a surgeon in determining to perform a primary operation during a condition of shock is to be determined by reference to pertinent facts then in existence, which were known or which ought to have been known in the exercise of due care, and not by reference to knowledge acquired after the operation has been performed.

**Mistake in Judgment.**

To the ordinary rule that the exercise of defendant's best judgment is no defense in an action for damages caused by his negligence, a general exception is recognized with respect to cases involving matters of opinion and judgment only. Vaughan v. Menlove, 3 Bing. N. C. 468, distinguished.

**Same.**

A physician entitled to practice his profession, possessing the requisite qualifications, and applying his skill and judgment with due care, is not ordinarily liable for damages consequent upon an honest mistake or an error of judgment in making a diagnosis, in prescribing treatment, or in determining upon an operation, where there is reasonable doubt as to the nature of the physical conditions involved, or as to what should have been done in accordance with recognized authority and good current practice.

**Same—Exception.**

The exception in malpractice cases applies to the formation of the judgment by such physician. It may not extend to the previous acquisition of data essential to a proper conclusion or to consequent conduct in the subsequent selection and use of instrumentalities with which he may execute that judgment.

**Reasons for Exception.**

The reasons for this exception are to be found in the character of the emergencies physicians meet, which often preclude deliberation; in the nature of their undertaking, which contracts for individual judgment and

[1] Reported in 111 N. W. 264.

skill; in the peculiarity of the human constitution, which presents difficulties not arising from insensate matter; in the nature of medical science, which is based on progressive knowledge; and in the inherent uncertainty of the expert testimony involved, which itself is the expression of opinion often in such cases founded on doubtful observation.

**Evidence.**

Here a physician amputated a crushed, bruised, and torn leg, the tibia of which had suffered an oblique compound, comminuted fracture. The operation was performed shortly after the injury had been caused by teeth on the revolving cylinder of a threshing separator into which the patient had fallen. The tibia was sawed in two places. Death ensued. It is *held* that, upon the testimony as to the condition of the patient and the evidence of experts, the physician was entitled to a directed verdict.

**Evidence—Quære.**

Quære, where only parts of the bones in controversy were exhumed and only parts of those parts, because of mutilation at the time of disinterment, were offered in evidence, whether they should have been received.

**Death not Evidence.**

The fact that a patient dies immediately after an operation is not of itself evidence of negligence on the part of the operating surgeon.

Action in the district court for Faribault county by plaintiff, as administrator of the estate of John Staloch, deceased, to recover $5,000 for death by wrongful act. The case was tried before Quinn, J., and a jury which rendered a verdict in favor of the plaintiff for $1,000. From a judgment entered pursuant to the verdict, defendants appealed. Reversed.

*Putnam & Nicholsen* and *H. L. & J. W. Schmitt,* for appellants.
*Lovely & Dunn* and *H. C. Carlson,* for respondent.

JAGGARD, J.

Defendants and appellants, duly licensed physicians and surgeons, practiced medicine as partners. One of them, Dr. Schmitt, amputated the right leg of plaintiff's and respondent's intestate, who died within a short time afterwards. The plaintiff had a verdict of $1,000. No motion for a new trial was made. This appeal was taken from a judgment entered upon a denial of defendants' motion for judgment, notwithstanding the verdict.

The original charges of actionable wrong included several which have been expressly waived. Counsel for plaintiff argues, however,

that the evidence tending to show an operation without consent justifies the verdict. The charge of the trial court referred, at one place, to the claim of absence of consent, and, at another, to the burden of proof in such a case; but, construed as a whole, it submitted to the jury as the real and only issue the liability of defendants for negligence. Plaintiff made no previous requests to instruct, suggested no changes at the close of the charge, and took no exceptions to it as given. Therefore, without reference to whether a cause of action for an assault would have survived (R. L. 1905, § 4503; McLean v. Burbank, 12 Minn. 438, 443 [530]), or to any question as to the necessity of plaintiff's election between a cause of action in assault and one in negligence (Wood v. Wyeth, 106 App. Div. 21, 94 N. Y. Supp. 360), plaintiff's right to recover in trespass vi et armis has been eliminated. This conclusion is the more satisfactory inasmuch as the great weight of evidence shows consent to the operation.

The question presented here is whether the evidence justified the verdict by showing negligence of the defendant (1) in performing the operation at all, and (2) in the manner of its performance. The testimony must be construed as favorably to the plaintiff as reasonably may be.

The brief facts thus resulting were as follows: The deceased, an apparently strong healthy man, twenty one years of age, working with a steam threshing outfit, stepped on the covering over the cylinder of a separator about to stop. A board slipped. His right foot went down in front of the revolving cylinder. The crew took him off the machine. A tooth or teeth of the cylinder had torn the flesh in the back part of the calf of his leg. Although the witnesses used different and inconsistent adjectives in describing the injury, it appears from their testimony and the circumstances that considerable flesh was mangled, crushed, and shredded; that the wound was large, lacerated, ragged, and oozing; that it was "ground full of chaff, dirt, and seeds"; and that bones and tissues were "gouged out." The young man was taken to a nearby house and Dr. Schmitt, one of the defendants, immediately sent for. The doctor arrived; was at once able to tell that an operation would be necessary, but did not decide on it then. It was at least an hour, he says, before he commenced to actually operate. This he did, according to his testimony, a little before one o'clock and

completed it before two, remaining for some hours afterwards and administering stimulants. Shortly after he left the patient died. The evidence of plaintiff tended to show that the patient died of shock; the evidence of the defendants, that he died from the effect of a bubble of air or fat or of a clot of blood which found its way to and stopped the action of the heart. No post mortem examination was made.

There was much contradiction in the testimony as to the last-mentioned times and facts, but it is not material here. Nor is it significant whether, as plaintiff's case tended to show and defendants' case to deny, the defendant subsequently made damaging admissions concerning the propriety of the operation, in view of his after-acquired knowledge. His negligence is to be determined by reference to pertinent facts then in existence, of which he knew or should have known in the exercise of due care, when the operation was performed. It would be a work of supererogation to cite authorities for so obvious and necessary a principle, or for this specific application of a general rule. There is an apt and neglected analogy in the rule restricting proof of the presence or absence of probable cause for instituting an original judicial proceeding complained of in an action for malicious prosecution to known or knowable facts in existence at the time of the commencement of that original proceeding.

Shortly before the trial, a priest of the local Catholic parish and a physician, who had been employed to get evidence for the plaintiff, and who was a competitor of the defendants, exhumed the body of the deceased, with which the amputated part of the leg had been buried. While at the grave the doctor took a screw-driver and pried off the tibia—at one end, from the ankle joint; at the other end, from the knee joint. In so doing, two or perhaps three pieces of bone were broken off near the ankle joint, and at a place much involved in controversy. These pieces of the tibia were not produced in court. The only explanation for their absence was that they were "tenderly" put back in the grave. The witnesses did produce the upper part of the tibia extending from the knee to where it was cut, and the lower part from the cut to the ankle joint, and also a part of the fibula. But they did not produce any of the bones of the foot concerning the controversies as to which, in consequence, they could and did give only oral testimony. The evidence in connection with the bones produced

showed an oblique compound comminuted fracture, and an "opening in the bone, the marrow canal," "six inches from the upper end of the opening to the lower end of the opening" which was, "between irregular edges of the bone about an inch wide at the top," and a little wider lower down. The pieces of bone which came out of this "long hole" were not found at the grave. The bones produced showed that the tibia had been cut twice, that a section of it about an inch long had disappeared without any fault attributable to the plaintiff or his witnesses. While the presence of the parish priest rebutted any inference of bad faith in the disinterment, it might well be questioned whether the production of only part of the bones in controversy, and of only parts of those parts because of their mutilation during the exhumation, justified the admission in evidence of the parts offered. Upon the record, however, as to objections and exceptions, it should be and will be assumed that there was no error in their reception.

1. The principles of law applicable to such a state of facts are clear and well-settled. In an ordinary action for negligence, that a man has acted according to his best judgment is no defense. The standard of careful conduct is not the opinion of the individual, but is the conduct of an ordinarily prudent man under the circumstances. In the leading case of Vaughan v. Menlove, 3 Bing. N. C. 468, 475, Tindall, C. J., said that to hold otherwise "would leave so vague a line as to afford no rule at all; the degree of judgment belonging to each individual being infinitely various." With respect to matters resting upon pure theory, judgment, and opinion, however, there is a generally recognized variation from this sound general principle. "The distinction between an error of judgment and negligence is not easily determined. It would seem, however, that if one, assuming a responsibility as an expert, possesses a knowledge of the facts and circumstances connected with the duty he is about to perform, and bringing to bear all his professed experience and skill, weighs those facts and circumstances, and decides upon a course of action which he faithfully attempts to carry out; then want of success, if due to such course of action, would be due to error of judgment, and not to negligence. But if he omits to inform himself as to the facts and circumstances, or does not possess the knowledge, experience, or skill which he pro-

fesses, then a failure, if caused thereby, would be negligence." The Tom Lysle (D. C.) 48 Fed. 690, 693.

Cases of malpractice may be within the exception. A physician entitled to practice his profession, possessing the requisite qualifications, and applying his skill and judgment with due care, is not ordinarily liable for damages consequent upon an honest mistake or an error of judgment in making a diagnosis, in prescribing treatment, or in determining upon an operation, where there is reasonable doubt as to the nature of the physical conditions involved or as to what should have been done, in accordance with recognized authority and good current practice. The many authorities to this effect will be found collected in great number in 22 Am. & Eng. Enc. (2d Ed.) 804, note 5, in note to Whitesell v. Hill, 37 L. R. A. at page 834, and in note to Gillette v. Tucker, 93 Am. St., at page 659. Later cases than are there cited are in accord. In MacKenzie v. Carman, 103 App. Div. 246, 92 N. Y. Supp. 1063, Ingraham, J., said: "The law thus requires a surgeon to possess the skill and learning which is possessed by the average member of the medical profession in good standing, and to apply that skill and learning with ordinary and reasonable care. He is not liable for a mere error of judgment, provided he does what he thinks is best after a careful examination. He does not guarantee a good result; but he promises by implication to use the skill and learning of the average physician to exercise reasonable care, and to exert his best judgment in the effort to bring about a good result." So in Wood v. Wyeth, 106 App. Div. 21, 94 N. Y. Supp. 360, the court held as a matter of law that a physician was not guilty of malpractice in performing an operation on the patient's right arm, because the evidence did not show that he failed to act according to his best judgment. He was therefore not responsible for the death of the boy.

The exception does not, however, apply to all that a physician or surgeon may do in the practice of his profession. There is often a fundamental difference in malpractice cases between mere errors of judgment and negligence in previously collecting data essential to a proper conclusion or in consequent conduct in the subsequent selection and use of instrumentalities with which the medical man may execute his judgment. In some matters, medicine is a science; in others, an art. Generally the exception governs cases in which it is a science; the rule,

cases in which it is an art. If, for example, a physician certifies that a man is insane without having made an examination, his negligence is of fact and not at all of science. But a medical man is not "bound to form a right judgment (as to sanity) so as to be liable to action if he does not." Crompton, J., in Hall v. Semple, 3 Fost. & F. 337; Williams v. Le Bar, 141 Pa. St. 149, 21 Atl. 525. When the physician is actually operating he is employing surgery as an art, and if, for example, he use an old rusty saw (Young v. Fullerton, reported in McClelland on Civil Malpractice, 253), or if he operate on the wrong arm (Sullivan v. McGraw, 118 Mich. 39, 76 N. W. 149) or sew up a sponge in an abdomen he has opened (Gillette v. Tucker, 67 Oh. St. 106, 65 N. E. 865, 93 Am. St. 639), his wrong concerns physical facts, and has fairly been held to be governed by ordinary principles of negligence. Where, however, due diligence and skill have been employed in ascertaining the essential preliminary information for an opinion whether a surgical operation should be performed or not, the formation of the judgment in accordance with appropriate scientific knowledge, in a case of reasonable doubt, is within the exception. It may be that Bennison v. Walbank, 38 Minn. 313, 37 N. W. 447, is inconsistent with the conclusion here reached. No question as to this exception to the rule, however, was adverted to in that decision.

2. One reasonable justification for this exception in many cases is the elementary principle that when a man acts according to his best judgment in an emergency but fails to act judiciously, he is not chargeable with negligence. The act or omission, if faulty, may be called a mistake, but not carelessness. See Brown v. French, 104 Pa. St. 604. Physicians in the nature of things are sought for and must act in emergencies, and if a surgeon waits too long before undertaking a necessary amputation, he must be held to have known the probable consequences of such delay, and may be held liable for the resulting damage. Du Bois v. Decker, 130 N. Y. 325, 27 Am. St. 529, 29 N. E. 313, 14 L. R. A. 429; Martin v. Courtney, 75 Minn. 255, 77 N. W. 813.

Another justification for the exception lies in the nature of the undertaking. Most professional men are retained or employed in order that they may give the benefit of their peculiar and individual judgment and skill. A lawyer, for example, does not contract to win a law-

suit, but to give his best opinion and ability. He has never been held to liability in damages for a failure to determine disputed questions of law in accordance with their final decision by courts of appeal. It would be just as unreasonable to hold a physician responsible for an honest error of judgment on so uncertain problems as are presented in surgery and medicine. Indeed, the peculiarities of the subject-matter with which medical men deal constitute another abundant justification for the exception. Those peculiarities concern, in the first place, the constitution of the human mind and body, and, in the second place, the nature of his science itself. On the human subject-matter with which physicians have to do the remarks of Woodward, J., in McCandless v. McWha, 22 Pa. St. 261, have become classical. Smothers v. Hanks, 34 Iowa, 286, 11 Am. 141. Judge Upton has, however, improved them: "The surgeon does not deal with inanimate or insensate matter like the stone mason or bricklayer, who can choose his materials and adjust them according to mathematical lines, but he has a suffering human being to treat, a nervous system to tranquilize, and an excited will to regulate and control. Where a surgeon undertakes to treat a fractured limb, he has not only to apply the known facts and theoretical knowledge of his science, but he may have to contend with very many powerful and hidden influences, such as want of vital force, habit of life, hereditary disease, the state of the climate. These or the mental state of his patient may often render the management of a surgical case difficult, doubtful, and dangerous; and may have greater influence in the result than all the surgeon may be able to accomplish, even with the best skill and care." Williams v. Poppleton, 3 Ore. 139, 147.

Physicians and surgeons deal with progressive inductive science. On two historic occasions the greatest surgeons in our country met in conference to decide whether or not they should operate upon the person of a president of the United States. Their conclusion was the final human judgment. They were not responsible in law either human or divine for the ultimate decree of nature. The same tragedy is enacted in a less conspicuous way every day in every part of the country. The same principles of justice apply. Shall it be held that in such cases, where there is a fundamental difference among physicians as to what conclusion their science applied to knowable facts

would lead to, then what they with their knowledge, training, and experience are unable to decide, and what, in the nature of human limitations, is not susceptible of certain determination, shall be autocratically adjudged by twelve men in a box, or by one man on the bench, or by a larger number in an appellate court, none of whom are likely to have the fitness or capacity to deal with more than the elements of the controversy? All the court can properly do if an action for negligence should be brought in such a case would be to direct a verdict for the physician. In Williams v. Poppleton, 3 Ore. 139, 145, Upton, J., said of a charge of negligence in the reduction of a dislocation: "In cases like this the court and jury do not undertake to determine what is the best mode of treatment or to decide questions of medical science upon which surgeons differ among themselves."

A final and practical reason for the exception to the ordinary rule in negligence cases is the inherent and inevitable uncertainty of available testimony. The basis of the proof of negligence and of the hypothetical questions to plaintiff's experts is naturally the narrative of the family or friends of the patient. Their testimony must ordinarily be unsatisfactory because of the presence of natural bias, the absence of technical knowledge essential to proper observation, and often the want of opportunity for actual perception, as will presently appear in this case. The physician, said Judge Upton, "is liable to have his acts misjudged, his motives suspected, and the truth colored or distorted, even where there are no dishonest intentions on the part of his accusers. And from the very nature of his duty, he is constantly liable to be called upon to perform the most critical operations in the presence of persons united in interest and sympathy by the ties of family, where he may be the only witness in his own behalf." Williams v. Poppleton, 3 Ore. 139, 146.

This is not necessarily, however, the greatest of the surgeon's tribulations. He is confronted by other uncertainties in testimony greater than those of the human constitution, however fearfully and wonderfully we may be made or act, and greater than those of physical science, however elusive it may be. He is faced by the eccentricities of medical experts. We have no inclination to share in the prevalent and intemperate denunciation of their unreliability and venality. But if every verdict mulcting a reputable physician in damages must be

sustained if any of his professional brethren can be induced to swear that, assuming the testimony of the family and friends of the patient to be true, the physician had made a mistake of judgment or had been guilty of unscientific practice, then the profession would be one which "unmerciful disaster follows fast and follows faster."

3. The imminent possibilities of injustice to individuals, and the difficulties of maintaining a uniformity of decisions in malpractice cases, led Judge Manly, in a case which has not attracted the attention it deserves (Woodward v. Hancock, 52 N. C. 384), to say: "What amounts to reasonable skill and care belongs to a class of questions which are said to be compounded of law and fact. In this class stand reasonable time, due diligence, legal provocation, probable cause, and the like. A division of the question in such cases between the court and the jury is now considered settled; and therefore, where there is a state of facts conceded or proved, it becomes the duty of the court to draw the conclusion as matter of law. If there be a conflict of testimony presenting different views of the case it is in like manner the court's duty upon these views to draw the proper conclusions." However this may be, we are of opinion that in this case in accordance with the rule that it is not for the court, but for the jury, to infer or not to infer negligence from the facts as well as to determine what the facts are, the defendants were entitled to have had a verdict directed in their favor upon the record as presented to us upon this appeal.

4. Plaintiff called two experts. The hypothetical question put to both assumed the truthfulness of the testimony as to the condition of the deceased at the time of the operation given by his older brother who was present when it was commenced. He was perturbed, excited, and manifested strong bias. He was a threshing hand without either capacity or opportunity for the observation or the understanding of most of the considerations which will hereafter be set forth as determining the propriety of the operation. He made no attempt at their enumeration. Defendants called more experts who answered hypothetical questions based upon the assumption of the correctness of Dr. Schmitt's statements as to the condition of the patient at that time, which enumerated those same complications subsequently referred to. Many disinterested witnesses and strong circumstances tended to corroborate the doctor and to contradict the brother. The

great weight of testimony as to the facts assumed was with the defendants. The overwhelming preponderance of testimony as to the scientific propriety of operating as and when the doctor operated was in his favor. This was true, not because his witnesses were more numerous than plaintiff's, but because they were more convincing. Their knowledge and experience on the subject were greater, their opinions were based upon fuller details of essential circumstances, they gave the more probable reasons, and their testimony was more consistent and more reasonable. See Gilfillan, C. J., in Getchell v. Hill, 21 Minn. 464, 471, and Mitchell, J., in Martin v. Courtney, 75 Minn. 255, 261, 77 N. W. 813. It is not sufficient to sustain the verdict that certain physicians testified that the operation was unnecessary and unjustified. Testimony that one of them would never perform such an operation while the patient was in condition of shock was incompetent.

5. But that the defendants should have prevailed on the merits, if the case had been governed by ordinary principles of negligence, is not the only consideration here. The determining point in the expert testimony is its certain result in these two propositions, namely: (1) Standard medical authorities and approved current practice recognize that there is a class of cases which justify a primary operation during a period of shock; (2) whether the present was or was not within that class depended upon the judgment of the surgeon who had examined all the conditions of the patient which were involved.

A brief summary of those conditions will serve to demonstrate how absolutely the question presented was one of judgment only. It requires no technical knowledge to perceive from the record in this case that the attending physician was compelled to take some immediate action; and that in determining whether he should operate or not he was called upon to exercise his judgment with reference to many complications. A just conclusion would have had reference, inter alia, to circumstances like the character of the fracture; the extent and condition of the wound; the exposure of marrow and nerve ends; the destruction of means of nourishment of the bone; the apparent present and probable future vitality of the extremity; the presence and causes of hemorrhage; the danger of blood poisoning at the time of his arrival, and of future infection, with reference to the length of

previous exposure; the character and quantity of foreign matter in the wound, and the extent to which it had been "ground into the tissues"; the degree and specific causes of existing shock; the apparent ability of the patient to resist shock, determined, inter alia, by observation of his skin, color, respiration, pulse, temperature, and reaction upon stimulants administered; the probable degree of shock which would have been produced by causes then existing if no operation had been performed or by adequate cleansing of the wound or by an operation.

This enumeration serves also to emphasize the propriety of holding that the liability of a physician for negligence in determining to operate in view of these considerations is governed by the exception to the general rules of negligence, and not by those rules which deny the validity of the defense that the individual exercised his best judgment, and to emphasize also grave doubt whether a jury is a competent tribunal to determine so complicated and technical an inquiry, and whether biased lay observation of a patient's condition should be regarded as an adequate basis for expert testimony.

6. The record, then, shows that the immediate amputation might, under conditions of the general character of those here present, have been in accord with proper scientific practice; that the operating physician made an uncriticized investigation into the conditions of his patient affecting the propriety of the operation; that the existence of the necessary conditions for a justified operation rested upon opinion; that the defendant in the exercise of his best judgment concluded they existed; and that thereupon, in the exercise of due care, he undertook to operate. Therefore he cannot be held responsible in damages even if his judgment was erroneous. That, however, we are not prepared to say was shown by sufficient evidence to take the case on that point to the jury.

The second claim of negligence rested upon the demonstrated fact that defendant made two amputations of the tibia. He had testified, before the bones showing this fact were produced, that he had operated once upon the tibia and twice upon the fibula because upon the latter he had found a "green stick fracture" above his first cut. This evident confusion is not significant in itself nor in view of an examination of the bones produced. The effect of the expert testimony, including that of one of plaintiff's own witnesses, was that in the effort

of the surgeon to leave as much of the leg as possible, and at the same time to get as good a flap as possible, it may be consistent with good surgery after one cutting has been made "to saw off a little more." The expert testimony does not show that the second cutting was a proximate cause of the result; but rather that "the mere fact of sawing an extra section of the bone, which is done in half a minute, does not materially increase the shock," and that even the amputation of a limb "where the patient is under the influence of an anæsthetic increases the shock but very little." The only negligence of which this administrator can complain is negligence which caused death.

The fact that the patient died immediately after the operation is in the view here taken not significant. In Haire v. Reese, 7 Phila. 140, Judge Thayer said: "No presumption of the absence of proper skill and attention arises from the mere fact that the patient does not recover. * * * God forbid that the law should apply any rule so rigorous and unjust as that to the relations and responsibilities arising out of this noble and humane profession." In Ewing v. Goode (C. C.) 78 Fed. 442, Judge (now Secretary) Taft said: "A physician is not a warrantor of cures. If the maxim 'res ipsa loquitur' were applicable, * * * and a failure to cure were held to be evidence, however slight, of negligence on the part of the physician or surgeon causing the bad result, few would be courageous enough to practice the healing art; for they would have to assume financial liability for nearly all the 'ills that flesh is heir to.'" If apart from the fact of death, there is no liability—and that is the conclusion in this case—that fact does not create it.

Judgment reversed.