[No. 3549.]

## McGraw v. Kerr.

1. PHYSICIAN AND SURGEON—*Liability for Malpractice.* A physician or surgeon, employed to treat an injury, in the absence of any special contract agrees that he possesses the reasonable skill and learning of others of his profession; that he will exercise his best judgment in the diagnosis, and in the treatment of the case, and reasonable and ordinary diligence, care and skill to effect a cure. He does not warrant a cure, and is not responsible for a failure therein, not resulting from his want of ordinary skill, or his failure to exercise ordinary care; and he is not responsible for mere mistakes of judgment. Nor is he chargeable with a result due to the patient's refusal to observe his directions.

2. —— *Evidence.* His skill in diagnosis and treatment are to be tested by the recognized rules of his own school, to be ascertained by the testimony of experts, and their opinions based upon the evidence.

The condition of the patient's injured member at the time of the trial is not evidence upon the question of the surgeon's negligence.

There is no difference between the character of testimony necessary to establish a standard of proper treatment, and that to establish a standard of ordinary care and skill.

3. NEGLIGENCE—*Presumption.* That the treatment of an injured person by a surgeon is followed by an unfavorable result raises no presumption of negligence on the part of the surgeon. The maxim *Res ipsa loquitur* has no application.

4. INSTRUCTIONS—*Shifting Burden of Proof.* An instruction which imposes upon the defendant the burden of proof which, by law, rests upon the plaintiff, is error.

5. —— *Submitting Incompetent Evidence.* An instruction which permits the jury to consider both competent and incompetent evidence upon the matter in issue is error.

6. NEW TRIAL—*Verdict Against the Weight of Evidence.* A verdict so manifestly against the weight of the evidence as to appear the result of bias or prejudice, misconception of the evidence, or of its legal effect, or either non-direction or misdirection as to the law of the case, will be set aside.

*Appeal from Denver District Court.* HON. HARRY C. RIDDLE, Judge.

Mr. WILLIAM J. MILES, for appellant.

Mr. George S. Redd, Mr. George Stidger, Mr. Horace G. Benson, for appellee.

King, J., delivered the opinion of the court.

Appellee brought suit to recover damages for injuries alleged to have been caused by the malpractice of the defendant, a physician and surgeon residing in the city of Denver. The complaint alleged that on June 23rd, 1907, plaintiff broke his arm near the shoulder; that he employed defendant to set the arm and treat the injury; that defendant failed to make proper examination of the arm to determine the nature of the injury, failed to properly diagnose the case as a fractured arm, but diagnosed it as a dislocation of the shoulder, and failed to properly set the fractured part of the arm, by reason of which plaintiff suffered severe pain and the arm was permanently shortened and weakened. Answer and reply were duly filed. Upon the issues made, trial was had, verdict returned and judgment rendered for the plaintiff in the sum of eight hundred dollars. Defendant challenged the sufficiency of the evidence to establish his negligence or want of skill and injury resulting therefrom, by motions for a directed verdict in his favor, made both at the time plaintiff closed his case in chief, and when all the testimony had been taken, and by motion for a new trial. That question, together with errors assigned for refusal to give certain instructions tendered, and for giving one to which objection was made, will be considered.

The evidence shows that plaintiff fell from a horse and thereby fractured his right arm. A physician was called who, within an hour of the time of the accident, examined the arm, pronounced the injury a dislocation of the shoulder, bandaged the arm, bound it to the body, and for lack of facilities at that place, advised that plaintiff (a boy 5 years of age) be taken to Denver for treat-

ment. . Next day, June 24th, defendant was called, heard the history of the case and was told by the boy's father of the diagnosis made by the other physician, and that he claimed to have reduced the dislocation, or, as the father expressed it, "pulled it back into place." Defendant examined the arm visually and by feeling and manipulation, found it swollen and painful; stated that it would be better to let the boy get over the shock before anything further be done, and that he would reduce the swelling and then could determine positively what the trouble was; recommended an X-ray, but said he would not put the father to that expense until he deemed it necessary, and that if he deemed it necessary to have an X-ray picture taken in order to ascertain the true condition, he would advise the father. The arm was rebandaged and complete rest and quiet directed. Defendant testified that he rendered the arm immobile by use of a small splint, but this was denied. Thereafter, for a part of the time only, the arm was in a sling. Defendant examined the arm daily, feeling of and manipulating the same, and on several occasions applied electricity for treatment of the nerves or for the purpose of diagnosis. The swelling continued for some days—about one week, according to testimony on behalf of plaintiff, and longer according to the defendant. July 8th defendant discovered the fracture and immediately ordered an X-ray picture of the parts, which was taken the same day by a specialist in such work, a physician and surgeon of many years' experience and practice, and in the presence of defendant and the father and mother of plaintiff. The skiagraph verified defendant's diagnosis and showed that the ends of the fractured bone were not in exact apposition, only about three-fourths of the ends butting against each other. There was no lapping of the parts longitudinally. Plaintiff's father was then told the condition of

the arm by both physicians; that they had detected crepitus (a grating or rubbing together of the ends of the bone, which both testified conclusively proved that union had not then taken place), and both advised that the fracture be reduced under anesthetics, and that if found necessary, a silver wire be inserted to hold the pieces in place. The fracture was of the surgical neck of the humerus, about one or one and one-fourth inches from the rim or head of that bone. Defendant arranged to take plaintiff next day to a hospital for an operation which it was understood he was to perform. But that night or early next morning defendant was discharged by plaintiff's father and had no further connection with the case. July 10th or 11th another skiagraph was taken by direction of Dr. Aubrey Williams of the medical staff of the county hospital, and on the 15th an examination of the arm was made by him and another physician. Dr. Williams, plaintiff's witness, testified that on the 15th he found considerable union had taken place—cartilaginous union, beginning to ossify; that he found a good surgical result; that the condition would not impair the usefulness of the arm, and so advised the father, and did not advise any further attempt to reduce the fracture. Another doctor called as an expert by plaintiff testified that in cases of known fracture, such as shown by the second skiagraph, the usual practice among physicians and surgeons was to bind the arm in splints, or render it immobile by a plaster cast. All expert testimony was to the effect that it is difficult to detect a fracture at the point where this was found, or to differentiate between a fracture and a dislocation after the arm had become swollen. The testimony for plaintiff showed that at the time of the trial a lump existed at the point where the bone was broken, and that in bad weather the boy favored that arm; (from birth the boy was lefthanded) that the bone

was misshapen, in that the union was somewhat angular. There was no evidence that the arm was shortened or the bone weakened, but on the contrary, that the bone is denser and stronger than before. There was evidence that the action of the muscles may be interfered with by the angular union; that the contour of the shoulder is not perfect, and that the arm hung in an unnatural position as compared with the other arm.

The question for determination was whether the defendant was guilty of negligence or want of skill in diagnosing and treating the injury during the time he had charge of the case, from which the injury complained of, if established, was caused.

In determining the liability of a physician and surgeon certain rules applicable to this case are well established by consensus of authorities. (1) In the absence of a special contract otherwise providing, a physician and surgeon employed to treat an injury, impliedly contracts that he possesses that reasonable degree of learning and skill ordinarily possessed by others of his profession, and that he will use reasonable and ordinary care and diligence in the exercise of his skill and the application of his knowledge to accomplish the purpose for which he is employed, and that he will use his best judgment in the exercise of his skill in deciding upon the nature of the injury and the best mode of treatment. *Burnham v. Jackson,* 1 Colo. App., 237; *Jackson v. Burnham,* (same case) 20 Colo., 532; *Bonnet v. Foote,* 47 Colo., 282, 285; 2 Thompson on Negligence, 2183. (2) He does not undertake to warrant a cure and is not responsible for want of success, unless that want results from failure to exercise ordinary care, or from his want of ordinary skill. *Burnham v. Jackson, supra; Bonnet v. Foote, supra.* (3) If he possesses ordinary skill and exercises ordinary care in applying it, he is not responsible for mistake of

judgment. *Staloch v. Holm,* 100 Minn., 276, 9 L. R. A., N. S., 712; *Bonnet v. Foote, supra; Fisher v. Niccolls,* 2 Ill. App., 484; *Sims v. Parker,* 41 Ill. App., 284; *Wurdemann v. Barnes,* 92 Wis., 206; *Dye v. Corbin,* 85 W. Va., 266. (4) The skilfulness of a physician in diagnosis and treatment should be tested by the recognized rules of his own school, and must be determined by resort to the testimony and opinion of experts, not only as to the correct diagnosis, but also as to whether the defendant exercised ordinary care and skill in examining the case and applying the remedies, such opinion to be based upon the facts in evidence. *Burnham v. Jackson, supra,* p. 536. (5) The fact that an injured limb is defective after treatment is not evidence of negligence on the part of the physician treating it. *Staloch v. Holm, supra; Ewing v. Goode,* 78 Fed., 442; *Piles v. Hughes,* 10 Ia., 579; *Bonnet v. Foote, supra; Wood v. Barker,* 49 Mich., 295. (6) A jury has no right to ignore testimony that has not been discredited and form independent conclusions on matters which require proof beyond their conjectures or opinions. *Wood v. Barker, supra; Wurdemann v. Barnes, supra.* (7) A patient is bound to submit to such treatment as his surgeon prescribes, provided the treatment be such as a surgeon of ordinary skill would adopt or sanction. If he will not, his neglect is his own wrong or mistake, for which he has no right to hold his surgeon responsible. *McCandless v. McWha,* 22 Pa. St., 261, 268; *Haire v. Reese,* 7 Phil., 138; *Carpenter v. Blake,* 75 N. Y., 12, 20.

Applying these rules we will first determine whether the testimony was submitted to the jury under instructions which correctly define the law applicable to the case.

1. Defendant requested an instruction to the effect that the fact that perfect or even good results were not obtained, is not of itself any evidence that the physician was negligent, and that in determining the question of

whether the defendant, upon the facts in evidence, was negligent or not negligent, the condition of plaintiff's arm at the time of trial or when defendant's treatment ceased, was not to be considered as evidence bearing upon that question. The instruction was refused, and its equivalent or substance was not given. Both from reason and authority it is clear that the result obtained from an operation, or treatment, in a case of medicine or surgery, is ordinarily neither *prima facie* nor any evidence of negligence. *Staloch v. Holm, supra; Ewing v. Goode, supra; Haire v. Reese, supra; Wood v. Barker, supra.* A surgeon may be assiduous, painstaking and careful to the last degree, using all the recognized means at his command, both ordinary and extraordinary, and still fail. In such case it is manifest that failure is neither the result nor evidence of neglect. Negligence on the part of a physician consists in his doing something which he should not have done, or in omitting to do something which he should have done. By allowing the jury to consider any imperfect position of the fragments of the bone which had been broken, as evidence of negligence, appellant was not tried for what he did or omitted to do, but by the criterion of results. If the jury could regard an imperfect position of the bone as evidence on the question of appellant's exercise of care, then the doctrine of *res ipsa loquitur* applies. The purpose of this instruction was to confine the jury's attention to what was competent evidence upon this one point by informing them what was not such evidence.

In *Bonnet v. Foote, supra,* the supreme court of this state, by Mr. Justice Gabbert, said that, the fact that an injured limb is defective after the patient has recovered, is not *prima facie* evidence of negligence on the part of the physician treating it. That was as far as it was nec-

essary to hold in that case. But in *Staloch v. Holm, supra,* the court said:

"The fact that the patient died immediately after the operation is, in the view here taken, not significant. In *Haire v. Reese,* 7 Phila., 140, Judge Thayer said: 'No presumption of the absence of proper skill and attention arises from the mere fact that the patient does not recover. * * God forbid that the law should apply any rule so rigorous and unjust as that to the relations and responsibilities arising out of this noble and humane profession,' " and quotes with approval the language of Judge (now president) Taft in *Ewing v. Goode, supra,* in which that distinguished man and jurist said:

"A physician is not a warrantor of cures. If the maxim *res ipsa loquitur* were applicable, and failure to cure were held to be evidence, however slight, of negligence on the part of the physician or surgeon, causing the bad result, few would be courageous enough to practice the healing art, for they would have to assume a financial liability for nearly all the ills that flesh is heir to."

In *Wood v. Barker, supra,* a cause in which the propriety of treatment of fracture by a physician was in issue, the supreme court of Michigan said:

"The fact that his limb is not restored to perfect soundness is not proof that he had been maltreated."

In *Sims v. Parker,* 41 Ill. App., 282, the court said that proof of a bad result is of itself no evidence of negligence, and that the jury cannot draw the conclusion of negligence from proof of what the result of the treatment was.

The maxim *res ipsa loquitur* has no place nor application in a case like this, and the jury should have been so advised.

The rule insisted upon in the instruction requested

and refused does not in any respect affect the right of the jury to consider the condition of the arm at the time the examination and diagnosis were made, for the purpose of ascertaining whether, in the exercise of due care and skill, such condition should have been discovered; nor the result, to ascertain the measure or amount of damages. Negligence was an issue the determination of which was possibly if not probably decisive of the liability of the defendant. The instruction asked was correct in legal effect and clearly applicable to a material question of fact in controversy, and the refusal to give it is prejudicial error unless the same be otherwise given in substance. *Marsh v. Cramer,* 16 Colo., 331; *Victoria Gold Mining Co. v. Fraser et al.,* 2 Colo. App., 14.

2. Appellant requested an instruction to the effect that in considering whether the defendant, in his diagnosis, care and treatment of plaintiff's injured arm, exercised ordinary care and skill, the jury could not set up a standard of its own, but must be guided in that regard solely by the testimony of physicians; and that if they were unable to determine from the testimony of physicians what constituted ordinary care and skill under the circumstances of this case, then there was a failure of proof upon the only standard for their guidance, and the evidence would be insufficient to warrant any verdict for the plaintiff.

The authorities are practically uniform in holding, and counsel for plaintiff admits, that as to what is or is not proper practice in examination and treatment, or the usual practice and treatment, is a question for experts, and can be established only by their testimony. But counsel for appellee attempts to draw a distinction between the character of testimony necessary to establish a standard of proper treatment, and a standard of what constitutes ordinary care and skill. We perceive no dif-

ference. The instruction goes no farther than to direct the jury in what is admitted by plaintiff's counsel to be the law. In either case the standard must be established by the testimony of experts. In *Jackson v. Burnham, supra,* the court, by Mr. Justice Goddard, said that, in order to determine whether the defendant (a surgeon) exercised ordinary care and skill in examining the case, as well as in applying remedies thereafter, resort must be had to the opinion of experts, based upon the ultimate facts as the jury may find them established by the weight of the evidence. The only rule asked for in the language of the instruction now under consideration is that upon the question of standard, by which the jury must be guided in arriving at a conclusion as to what constituted care and skill, the testimony of experts (in this case, the physicians) alone must be considered. The standard and the testimony by which it can be ascertained are the only matters involved. Upon that question we think there is no contrariety of opinion. If no standard was established by the testimony of physicians, then the jury had no standard. This does not militate against the right of the jury to decide between conflicting testimony of different physicians or experts on the question of a standard; it only goes to the extent that if in doubt upon any matter necessary to enable the jury to say that a standard has been fixed for its guidance by the testimony of such qualified witnesses, then it cannot from other and incompetent evidence, or without evidence, raise a standard. We think that refusal to give this instruction, and the giving of the instruction as modified by which the jury was permitted to find such standard from all of the testimony, both competent and incompetent as to that question, constituted error.

3. The court instructed the jury that if it believed from the preponderance of the evidence that at the time

the defendant was discharged from the case the fractured bones of plaintiff's arm had not united and were so that they could have at that time been brought into proper position, and that the condition of which plaintiff complains arose or occurred after that time, without fault or negligence on the part of the defendant, then the defendant is not responsible for such injury or condition, and a verdict should be in his favor.

The fact that defendant was discharged immediately after he had discovered the fracture, and before he had set or attempted to set the arm, was disclosed by plaintiff's testimony in chief, as well as by that of the defendant; therefore, it became necessary for plaintiff to establish as an affirmative part of his case, by a preponderance of the evidence, that the condition of which he complained existed at the time of the discharge, and that permanent injury would not have been averted by compliance with defendant's directions. The instruction so given changed the burden of proof and placed it upon the defendant, requiring him to establish by a preponderance of the evidence that such condition did not exist; that union had not taken place to such an extent as to make it impracticable or unreasonable for plaintiff to comply with his advice that the fracture be reduced after that lapse of time. In that respect the giving of the instruction was error.

II. Plaintiff alleged that defendant, being called to set a fractured arm, diagnosed the case as a dislocation of the shoulder, and treated it accordingly. Defendant alleged that he was called to treat a recognized case of dislocation, and to alleviate the suffering and condition arising therefrom. The testimony of both plaintiff and defendant tends to support the latter view, and defendant may have so understood his employment, as it is undisputed that he was notified upon entering the case that the

injury had been diagnosed by a physician as a disloca-
tion, and the dislocation reduced; and it is admitted that
for a time defendant tentatively accepted such former
diagnosis and treated the arm accordingly. The evidence
fails to show that in the diagnosis defendant did not use
the means and method ordinarily and usually used by
other physicians. It is true, he did not at first make use
of the X-ray or of anesthetics. Both of these means were
discussed by the defendant with the father of plaintiff,
and with his consent, or at least without objection, de-
ferred for a time, and for apparently good reason. No
evidence was offered to show that under the conditions
it was usual or customary at that time and place, among
physicians of defendant's school, or immediately neces-
sary, to either use the X-ray or resort to anesthetics in
diagnosis, or that failure to do either constituted want
of care or skill. By proceeding upon a diagnosis not
made by him, but accepted, the treatment by daily rota-
tion or manipulation of the arm probably caused some
degree of pain and suffering, in excess of what the plain-
tiff would have endured if the fracture had been discov-
ered sooner. But that treatment, in all probability, pre-
vented a union of the parts and resulted in the non-union
as found by the defendant at the time he discovered the
fracture. In view of the conditions, as stated, under
which defendant took charge of the case, there is reason
for believing and holding that the failure of the defend-
ant to use the X-ray, or anesthetics, as a means of diag-
nosis, if error, was a mere mistake or error of judgment.
We are unable to see that such error, if error it was, was
so gross as to be inconsistent with that degree of skill
which it is the duty of a physician to possess. The facts
of this case differ from those of any reported case that
has come to our attention. We have read many in which
the physician was held liable for improper diagnosis re-

'sulting in injury, but no case in which, although an incorrect diagnosis, or no diagnosis at all for a time was shown, it was followed by a correct diagnosis immediately after which the physician was discharged and his advice disregarded. This difference in facts to our mind marks a vital distinction in this case. It is clear that if union of the parts which thereafter became permanent, and of which plaintiff complains, did not exist at and prior to the time of defendant's discharge, defendant cannot be held liable. The evidence of the defendant and Dr. Stover, the specialist who took the skiagraph, that union did not exist upon the day that the fracture was discovered, and the defendant discharged, is undisputed, and Dr. Stover, so far as shown by the record, was a wholly disinterested witness. This testimony is not to our mind seriously discredited. The testimony of Dr. Williams that upon an examination made five days later, during which time there had been no manipulation of the arm, he then discovered no crepitation, but found considerable union, does not seriously discredit it, as there is undisputed expert testimony that such union within that time and under those conditions would not be unusual. There is not a scintilla of evidence from which either the jury or this court can say or infer that from the skiagraph either laymen or specialists could determine whether permanent union existed, inconsistent with the testimony of defendant's witnesses, or, to discredit the testimony of the defendant and Dr. Stover that crepitus was either felt or heard by them. Such may be discoverable from a skiagraph, but testimony of qualified persons to that effect was, in our opinion, essential. Moreover, the undisputed testimony of plaintiff's own expert is that the skiagraph introduced by plaintiff showed the parts in a grossly exaggerated and distorted condition, and this was the one from which Dr. Lewis, plaintiff's expert witness, tes-

tified that a fracture such as there shown required certain treatment. Plaintiff's father and guardian assumed the responsibility of disregarding defendant's advice and discharged him. There is no evidence from which it can be said, or, as we view it, legitimately inferred, that by following the advice given the bones might not have been placed in exact apposition, and so held, and the condition now complained of completely averted; and to our mind this fact brings the case clearly within the authorities hereinbefore cited, that if a patient will not submit to such treatment as his surgeon prescribes, he has no right to hold his surgeon responsible for results, provided the treatment advised be such as a surgeon of ordinary skill would adopt or sanction.

Some of the matters to which we have called attention, and concerning which we have expressed our own conclusions, are doubtless matters which, under proper instructions, should be left for determination by the jury. But, as a whole, the evidence is so unsatisfactory, unsubstantial and insufficient, as viewed by us, to fix liability upon the defendant, as to emphasize the necessity for the instructions which were requested and refused, as well as a proper modification of the instruction given and objected to; and to justify a refusal to sustain the verdict or affirm the judgment upon the principle that such errors are not substantial or prejudicial.

Objection is also made to the verdict and judgment as excessive, it being insisted that if any judgment whatever can be sustained, it should be for nominal damages only. As we view the case upon the record, the only evidence of damages to sustain a verdict for any amount would be that which tends to show that plaintiff suffered greater pain by reason of the manipulation of the arm while considering the injury a dislocation than he would have suffered had proper diagnosis been theretofore

made. We are not satisfied that the jury intended to find, or might reasonably have found, a verdict in the amount herein returned for that element alone of the damage claimed. The verdict is so manifestly against the weight of the evidence as to appear to be the result of bias or prejudice, misconception of the evidence or the legal effect thereof, or of non-direction or misdirection as to the law, as hereinbefore ruled. The judgment should be reversed and the cause remanded, and it is so ordered.

Judges CUNNINGHAM and MORGAN dissent.