**Kristian OUELLETTE, a minor, by Frank OUELLETTE, his father and natural guardian, and Frank Ouellette, individually, Petitioners-Appellants,**

v.

**Barbara H. SUBAK and Maxine O. Nelson, Petitioners-Respondents.**

No. C4-85-571.

Supreme Court of Minnesota.

Aug. 8, 1986.

Reed K. Mackenzie and Mark Hallberg, Minneapolis, for petitioners-appellants.

Jerome C. Briggs and Charles E. Lundberg, Minneapolis, for petitioners-respondents.

KELLEY, Justice.

The father of a child born with brain damage brought this negligence action on behalf of the child and himself against two medical general practitioners. The trial court refused to give the doctors' requested jury instructions that physicians are not responsible for an honest error in judgment. A Hennepin County jury by special verdict found the doctors negligent and awarded $1 million in damages. Following denial of their post trial motions and entry of judgment on the verdict, the doctors appealed.[1] Holding that the trial court erred when it refused to give the so-called "honest error in judgment" instruction, the court of appeals reversed and remanded for a new trial on all issues.[2] Both parties petitioned this court for further review. Both petitions were granted. For the purpose of this opinion, the Ouellettes will be denominated appellants and the physicians, respondents. Appellants here challenge the court of appeals' reversal, claiming the trial court correctly refused to give the "honest error in judgment" instruction. Respondents allege error in admission of an alleged expert's testimony on causation, and claim insufficiency of the evidence to support the findings of negligence and causation.[3] We affirm the court of appeals.

Kristian Ouellette is a brain-impaired child with profound physical and mental retardation. Six and one-half years after his birth he was functioning developmental-

---

1. By stipulation the parties agreed that if the child recovered damages, the trial court could enter judgment in favor of the father for his medical expense claim. Accordingly, judgment was entered for Frank Ouellette in that amount plus interest and costs.

2. *Ouellette v. Subak*, 379 N.W.2d 125 (Minn.Ct. App.1985).

3. Because the court of appeals remanded for a new trial, it did not rule on respondent's contention that the trial court had erred in admitting the expert's opinion. It did note, however, that the trial court should evaluate any expert witness at the retrial under article 7 of the Minnesota Rules of Evidence. The court noted that the findings of causal negligence presented a close question, and, provided full and proper instructions had been given, was for jury resolution.

ly between the age of 6 and 13 months. He can sit and crawl, but cannot stand without braces nor walk without help. He can drink from a cup and hold a spoon but is unable to feed himself. He can neither talk nor communicate basic needs. His problems are permanent. Doctors expect no significant development in his higher intellectual function nor in his self help skills. His parents contend his problems were caused by the negligence of respondents, two family practitioners—Dr. Barbara H. Subak and Dr. Maxine O. Nelson. The negligence claimed is failure to intervene in a prolonged pregnancy.

Julie Ouellette, then 20, suspected she was pregnant with her first child in February 1977. She and her husband had regularly practiced birth control but had a single act of unprotected intercourse on January 23, 1977. On March 11, she first saw Dr. Subak, a board certified family practitioner. Approximately 15 percent of Dr. Subak's practice was obstetrics. She told the doctor that the onset of her last menstrual period was January 5, 1977. A pregnancy test was positive. After taking a history and making a physical examination, Dr. Subak calculated the "estimated date of confinement" (EDC), or due date, as October 12, 1977.

At a May 12 prenatal visit, Dr. Maxine Nelson, Dr. Subak's associate, detected no fetal heart tones, usually heard at 18 to 19 weeks. These heart tones were detected by Dr. Subak for the first time on June 11.

As the pregnancy progressed, Dr. Subak began to entertain doubts about the validity of the EDC. A September 8 examination revealed that the fetus was still floating rather than "engaging" in the pelvis. Normally, the fetus descends into the mother's pelvis approximately one month before delivery. On a September 28 examination, the fetus was still floating, a fact Dr. Subak considered unusual at 38 weeks, two weeks before the calculated due date.[4]

More doubts as to the EDC were raised in Dr. Subak's mind when at an October 7 examination, only five days from the EDC, the fetus was still floating and the cervix was still closed. On a pelvimetry, an x-ray of the pelvis, taken that day, the femoral epiphysis of the fetus—the growth plate at the end of the femur—was not visible. The femoral epiphysis, which ossifies separately from the femur, is normally visible by x-ray on a male fetus at 36 weeks.

Five days after the EDC, on October 17, Dr. Subak found the cervix was beginning to soften, but the head of the fetus was barely into the pelvis. A week later Dr. Nelson noted a soft but closed cervix and that the baby's head was at the same station in the birth canal as the previous week. Similar findings were made on November 2.

On November 9 Dr. Subak admitted Mrs. Ouellette to Metropolitan Medical Center to induce labor and conduct an oxytocin challenge test (OCT).[5] Dr. Subak consulted with Dr. John N. Maunder, a board-certified obstetrician. Although Mrs. Ouellette was at 43 weeks, or three weeks overdue by medical history, Dr. Subak felt from her clinical observation the pregnancy was at 39 weeks. Dr. Maunder examined Mrs. Ouellette and found her cervix thick and closed and her membranes intact. He saw no immediate need to terminate the pregnancy. Dr. Maunder noted the baby was very active, making it difficult to get heart tracings. He considered the EDC off and

4. Only four percent of babies are born on the actual "due date," calculated as 40 weeks after the onset of the last menstrual period. Delivery anytime between 38 and 42 weeks is considered a term pregnancy. Approximately 10 percent of births occur after the 42nd week and are considered higher risk. After 44 weeks, risks of fetal death or injury increase significantly. This occurs principally because the placenta, the organ that transfers nutrients and oxygen from the mother to the fetus, deteriorates. This deterioration is called placental insufficiency.

5. The oxytocin challenge test is designed to measure fetal well-being by seeing how the fetus responds to the stress of induced labor contractions. This is done by monitoring fetal heart tones while stimulating contractions. A negative or normal result means the baby is not in distress and can remain in the uterus another week.

advised Dr. Subak to stimulate labor cautiously and conduct a prolonged OCT.

Results of the OCT were normal on November 9 and 10. Mrs. Ouellette did not go into labor and was discharged from the Center. She returned November 17 for another OCT which was again negative and failed to lead to real labor. When Dr. Nelson saw Mrs. Ouellette on November 25, she observed the cervix was softening but the fetus' head was still floating. On November 30, Dr. Subak admitted Mrs. Ouellette for another OCT and induction of labor. The OCT was again normal but Mrs. Ouellette still did not progress into labor. Dr. Nelson visited the patient in the hospital that evening and consulted with Dr. John T. Moehn, an obstetrician. On examination, he found the fetus was large but still floating. He recommended terminating the pregnancy by Caesarean section. The situation was not considered an emergency because the fetal monitoring strips were normal, indicating the baby was not in jeopardy.

The following morning, Dr. Mitchell Pincus performed a Caesarean section and delivered a baby weighing 9 pounds, 13 ounces. The Caesarean section was performed because the baby was considered large and post-mature. Dr. Pincus, however, observed no classic signs of "post-mature syndrome," such as shriveled skin. He found no gross abnormalities in the placenta, so it was not sent to a pathologist for microscopic evaluation. Dr. Pincus also recalled no meconium in the amniotic fluid, an indicator of fetal distress.

The evidence is conflicting on the state of Kristian's health at birth and during his hospital stay. Generally, the appellants assert he displayed signs indicative of previous fetal distress. To the contrary, the medical evidence, photographs, and recognized tests such as the Apgar scores,[6] respondents contend, show the absence of the alleged fetal distress blamed for Kristian's admittedly severe developmental impairments.

The complaint charged the two physicians with negligence in permitting a prolonged pregnancy, failing to timely induce labor or recognize increased risks of injury to the fetus, and ignoring signs of fetal distress. In defense, the physicians alleged: (1) they neither erred in their diagnosis nor treatment of the pregnancy; (2) if they did err, it was not negligence, but an honest error in professional judgment, and (3) any alleged negligence was not the cause of Kristian's condition.

1. The trial court refused to give the "honest error in judgment" instruction found in the last sentence of 4 Minn.Dist. Judges Ass'n, Minnesota Practice, JIG II, 425 G–S (2d ed.1974).[7] This was done notwithstanding one of respondents' defenses was that even had they erred in handling Mrs. Ouellette's pregnancy, the error was not negligence but an honest error in judgment. The portion of the JIG II, 425 G–S instruction omitted reads:

> A [physician] is not a guarantor of a cure or a good result from his treatment and he is not responsible for an honest error in judgment in choosing between accepted methods of treatment.

The court of appeals ruled that elimination of the "honest error in judgment" instruction rendered the trial court's instruction insufficient to state the standard of care applicable to a physician. In doing so, it noted and relied upon the fact the "honest error in judgment" rule has been recognized in Minnesota since at least 1907 and

---

6. Apgar scores are given on a 10 point scale with 2 points assigned to each of 5 areas: heart rate, respiration, muscle tone, reflex irritation and skin color.

7. The full instruction given by the trial court is as follows:

> In performing professional services for a patient, a physician must use that degree of skill and learning which is normally possessed and used by physicians in good standing in a similar practice and under like circumstances.
>
> In the application of this skill and learning, the physician must also use reasonable care.
>
> The fact standing alone that a good result may not have followed from the treatment by a physician is not evidence of negligence or unskilled treatment.

followed in a long line of medical negligence cases up until recent times. *Ouellette*, 379 N.W.2d at 128, 130. That observation and reliance was well placed. *See, e.g., Staloch v. Holm*, 100 Minn. 276, 111 N.W. 264 (1907); *Manion v. Tweedy*, 257 Minn. 59, 100 N.W.2d 124 (1959); *Silver v. Redleaf*, 292 Minn. 463, 194 N.W.2d 271 (1972); *Todd v. Eitel Hospital*, 306 Minn. 254, 237 N.W.2d 357 (1975); *Kinning v. Nelson*, 281 N.W.2d 849 (Minn.1979).

In *Staloch*, the court first outlined reasons for applying the rule in medical negligence cases:

> In an ordinary action for negligence, that a man has acted according to his best judgment is no defense. The standard of careful conduct is not the opinion of the individual, but is the conduct of an ordinarily prudent man under the circumstances. * * * With respect to matters resting upon pure theory, judgment, and opinion, however, there is a generally recognized variation from this sound general principle. * * *
>
> Cases of malpractice may be within the exception. A physician entitled to practice his profession, possessing the requisite qualifications, and applying his skill and judgment with due care, is not ordinarily liable for damages consequent upon an honest mistake or an error of judgment in making a diagnosis, in prescribing treatment, or in determining upon an operation, where there is reasonable doubt as to the nature of the physical conditions involved or as to what should have been done, in accordance with recognized authority and good current practice. * * *
>
> * * * * * *
>
> * * * Most professional men are retained or employed in order that they may give the benefit of their peculiar and individual judgment and skill. A lawyer, for example, does not contract to win a lawsuit, but to give his best opinion and ability. He has never been held to liability in damages for a failure to determine disputed questions of law in accordance with their final decision by courts of appeal. It would be just as unreasonable to hold a physician responsible for an honest error of judgment on so uncertain problems as are presented in surgery and medicine.[8]

100 Minn. at 280–283, 111 N.W. at 266–67.

Moreover, in protecting a physician from liability for mere errors in judgment in choosing between alternate diagnoses or treatments, this court has followed a rule recognized by at least 29 other jurisdictions. *See also* W. Keeton, D. Dobbs, R. Keeton and P. Owen, Prosser & Keeton on the Law of Torts 186 (5th Ed.1984).

Appellants would have us rule: (a) that even if the "honest error in judgment" instruction correctly states the law applicable in certain circumstances, it was inapplicable here and, therefore, the trial court's instruction was sufficient to convey a clear and correct understanding of the law to the jury (*see Sandhofer v. Abbott-Northwestern Hospital,* 283 N.W.2d 362, 367 (Minn. 1979)); and (b) that this court should follow a so-called "modern trend" of authorities excluding the "honest error" language from the physician liability instruction.

(a) We agree with the majority of the court of appeals that if the respondents were entitled to the "honest error in judgment" instruction, the trial court's refusal to give it in this case was prejudicial error. Here the standard of care was crucial. The respondent physicians were receiving conflicting information. Their physical observations and tests, made periodically during the course of the pregnancy, conflicted with the presumed date of conception, and therefore the EDC. Determination of whether to allow the pregnancy to continue or terminate depended upon an exercise of

---

**8.** Indeed, this court has recently applied the honest error rule in attorney malpractice cases. *See, e.g., Cook v. Connolly*, 366 N.W.2d 287, 292 (Minn.1985) (no liability for error within bounds of an honest exercise of professional judgment); *Glenna v. Sullivan*, 310 Minn. 162, 169, 245 N.W.2d 869, 872–73 (1976) (good faith judgment, even if error, not deemed malpractice).

their judgment at a time when a reasonable doubt existed as to the stage of the pregnancy and what should be done. Failure to give the requested instructions deprived the physician of the right to have the conduct evaluated in that light, and likewise deprived their counsel of the right to argue the issue before the jury.

(b) Moreover, we reject, in part at least, appellants' invitation to follow a few courts that have rejected the "honest error" rule claiming it to be potentially misleading (*see, e.g., Wall v. Stout,* 310 N.C. 184, 311 S.E.2d 571 (1984)); or claiming it presumably conflicts with ordinary care language suggesting a disjunctive standard of care for a physician (*Teh Len Chu v. Fairfax Emergency Medical Associates, Ltd.,* 223 Va. 383, 290 S.E.2d 820 (1982)); or claiming the language "confuses" the jury by implying only bad faith errors are actionable (*Logan v. Greenwich Hospital Association,* 191 Conn. 282, 465 A.2d 294 (1983), *Magbuhat v. Kovarik,* 382 N.W.2d 43 (S.D.1986)). In *Kinning v. Nelson,* 281 N.W.2d 849, 853 (Minn.1979), we recently rejected some of those very same arguments.

Nevertheless, appellants' contention, joined by at least two dissenting judges of the court of appeals, that the words "honest error" are inherently subjective and inject into a negligence action irrelevancies of good or bad faith, is not completely meritless. Elimination of subjective words such as "honest" or "good faith" while retaining a jury instruction on the limitations of professional liability seems to us to strike a medium that will meet most of the objections raised about the "honest error in judgment" rule, but yet serve to caution the jury that liability should not be imposed merely because of a bad result or the "wrong" choice of an accepted method of professional care.

Professionals are hired for their judgment and skill. If there is a lack of skill (the knife slips for a doctor or a statute of limitations is missed by a lawyer), we have a straight-forward enough malpractice claim. But if the claim involves a question of professional judgment, a choice of strategies or treatment, there may be a need, as we explained in *Staloch v. Holm,* 100 Minn. 276, 111 N.W. 264 (1907), to caution the trier of fact in applying the standard of care to the professional's conduct. The instruction that a doctor "is not responsible for an honest error in judgment in choosing between accepted methods of treatment," is an attempt to meet this problem, but the instruction, because it tries to set out the *Staloch* rationale in shorthand fashion, tends to be subjective and, perhaps on occasion, misleading.

If there are two methods of treatment for a particular medical condition, both accepted by the medical profession, then it is a matter of professional opinion or judgment which is best, and the doctor's choice of either is, ordinarily, not negligence. But what if the two methods of treatment depend on different factual bases, *i.e.,* if one method is acceptable if the facts are one way and the other method is acceptable if the facts are another way, and neither method is acceptable for both sets of facts? Then the doctor who fails to use reasonable care to ascertain the facts may be negligent if he or she does not choose the accepted method of treatment for the factual condition a reasonably prudent doctor would have ascertained.

But what if, at the time a decision must be made, all the requisite facts, even with the exercise of reasonable care, cannot be ascertained and either of two methods of treatment reasonably appears acceptable? At times a doctor may have to make a decision on the basis of incomplete, unclear, or tentative data, a situation which leaves a doctor vulnerable to hindsight and second guessing if the result is bad. Because of this problem, particularly characteristic of a professional practice, this court in *Staloch* said a doctor should not ordinarily be liable for an honest error of judgment *"where there is reasonable doubt* as to the nature of the physical conditions involved or as to what should have been done." *Id.,*

100 Minn. at 281, 111 N.W. at 266 (emphasis added).[9]

▪▪▪ Upon reflection we now conclude the time has come to hold that in professional malpractice cases the mostly subjective "honest error in judgment" language is inappropriate in defining the scope of the professional's duty toward those the professional serves. In our view, henceforth, in a medical negligence case, preferably the jury should be instructed as follows: A doctor is not negligent simply because his or her efforts prove unsuccessful. The fact a doctor may have chosen a method of treatment that later proves to be unsuccessful is not negligence if the treatment chosen was an accepted treatment on the basis of the information available to the doctor at the time a choice had to be made; a doctor must, however, use reasonable care to obtain the information needed to exercise his or her professional judgment, and an unsuccessful method of treatment chosen because of a failure to use such reasonable care would be negligence.

Notwithstanding that conclusion, it does not follow that the court of appeals erred in remanding this case for a new trial. An extremely close issue existed whether the respondents' prenatal judgment not to terminate the pregnancy was due to failure to exercise reasonable care. In the light of the facts of this case, had the jury been given even the modified instruction that we today propose eliminating the "honest error" language, the verdict might well have been different. This is particularly true because of the existence of controverted causation issues. Therefore, we agree with the court of appeals that failure to sufficiently inform the jury on professional liability rules was prejudicial, requiring a new trial.

2. Respondents on appeal contend that Dr. Stephen Smith, a pediatric neurologist who testified as an expert witness for the plaintiffs, was incompetent to testify on the obstetric cause of Kristian's condition. Respondents assert that Dr. Smith was utterly inexperienced and unqualified in the field of obstetrics. He had never managed a pregnancy nor had he delivered a baby in the ten years preceding the trial. His sole experience in delivering babies occurred while he was an intern during his first year out of medical school. He had no expertise in the use and analysis of oxytocin challenge tests. He admitted he was unqualified to read OCT fetal monitoring strips. He did not regularly read obstetrical/gynecological journals. All those facts were educed on cross-examination and therefore were known to the jury. In claiming Dr. Smith's testimonial incompetency to testify on the issue of causation, respondents rely on *Lundgren v. Eustermann*, 370 N.W.2d 877 (Minn.1985) where we did emphasize that a witness testifying as an expert must have some practical knowledge or experience. Here the trial judge could have found, unlike the witness in *Lundgren*, that Dr. Smith did have at least a minimal practical experience.

Determination of witness competency is a question of fact within the discretionary province of the trial judge. Unless the judge's ruling is based on an erroneous view of the law or is clearly not justified by the evidence, it will not be set aside by an appellate court. *Cornfeldt v. Tongen*, 262 N.W.2d 684, 692 (Minn.1977). *See also* Minn.R.Evid. 702, Committee Comment (1977). Notwithstanding its existence, that discretion is not without bounds. We have held certain witnesses incompetent in medical negligence cases. *See, e.g., Reinhardt v. Colton*, 337 N.W.2d 88 (Minn.1983); *Swanson v. Chatterton*, 281 Minn. 129, 160 N.W.2d 662 (1968).

▪▪▪ In this case, the resolution of the challenge to the competency of Dr. Smith is extremely close. Had we been in the position of the trial judge, we might well have found Dr. Smith incompetent to testify as an expert on the issue of obstetrical causation. However, we cannot conclude the admission of his testimony was reversible

---

9. In *Cook v. Connolly*, 366 N.W.2d 287 (Minn. 1985), this court quite properly recognized the *Staloch* rationale as pertinent to evaluating evidence on a motion for summary judgment. We were not, however, discussing how best to convey this rationale in a jury instruction.

error. It was not clearly erroneous. Additionally, the admission of the causation opinion of Dr. Smith was not prejudicial. By cross-examination, respondents were able to point out not only the inherent weakness of his opinion, given the absence of clinical evidence, but also his minimal training and experience in the field of obstetrics. Finally, we note that respondents elicited an opinion on causation from a defense expert who was also, like Dr. Smith, a pediatric neurologist.

3. Lastly, respondents contend the evidence is insufficient as a matter of law to sustain the jury verdict finding them causally negligent and responsible for Kristian's damages. If respondents are correct, of course, the judgments of the trial court should be reversed, and a remand for a new trial would be unnecessary.

We commence our consideration with reiterating the fundamental rule that jury verdicts are to be set aside only if manifestly contrary to the evidence viewed in a light most favorable to the verdict. *Lamke v. Louden*, 269 N.W.2d 53, 56 (Minn.1978). A verdict will not be set aside unless the evidence against it is practically conclusive. *Sandhofer v. Abbott-Northwestern Hospital*, 283 N.W.2d 362, 368 (Minn.1979).

■ A reading of this record demonstrates that the issues of negligence and obstetrical causation were not only contraverted, but extremely close. Had proper instructions been given to the jury, the jury's verdict could well have been different. However, without reciting the often conflicting evidence in detail, we are convinced resolution of those issues was for the jury. If properly instructed, the jury could find the existence or lack of negligence and causation. Accordingly, since we cannot concur with the respondents' contention that the evidence against the verdict was "practically conclusive" we decline to set aside the verdict and order entry of judgment notwithstanding the verdict. Accordingly, we affirm the court of appeals and remand for new trial on all issues.

WAHL and COYNE, JJ., took no part in the consideration or decision of this case.