SALLY LOU TODD v. EITEL HOSPITAL AND OTHERS.

237 N. W. 2d 357.

November 28, 1975—No. 45108.

*Lynn S. Castner* and *George M. Stephenson*, for appellant.

*Mahoney, Dougherty & Mahoney* and *Thomas E. Dougherty*, for respondent hospital.

*Coulter, Nelson & Sullivan* and *Mark Sullivan*, for respondent Sanchez.

Heard before Kelly, Todd, and Chanak, JJ., and considered and decided by the court en banc.

KELLY, JUSTICE.

This is an appeal by plaintiff from an order of the Hennepin County District Court granting defendants' motion for dismissal at the close of plaintiff's case and an order denying her a new trial in this medical malpractice case. We affirm.

On May 18, 1967, Dr. Jose Sanchez was working as a vacation replacement for the regular pathologist at Eitel Hospital. As a clinical pathologist, he examined a piece of tissue which had been part of a tumor removed from plaintiff Sally Lou Todd's left forearm by Dr. Paul Stewart. Dr. Sanchez' diagnosis of the tissue sample he had had prepared for examination was compound nevus, a benign tumor.

In 1970, Ms. Todd contacted Dr. Henry Buchwald at the University of Minnesota Health Service about a recent discovery of lumps in her left axilla, or armpit. He took her history of the 1967 surgery and upon examination found no evidence of recurrence in the area of the left forearm. His physical examination

of plaintiff led to a preliminary diagnosis of metastatic cancer in the left axilla, meaning a tumor which has spread from a different site of origin, either through the blood, muscles, or lymphatic system. Since plaintiff had had the tumor removed from her left arm in 1967 and since there was no evidence of cancer anywhere else in the body, he concluded that it had spread from the left arm to the shoulder area. To confirm this Dr. Paul Lober, University Hospitals' surgical pathologist, routinely examined the Eitel Hospital slide prepared in 1967 by Dr. Sanchez. Due to fading, a second slide was prepared from the original tissue sample, and both slides were sent to Dr. Lober. Both he and Dr. Theodore Grage, director of the University Tumor Clinic, were of the opinion that the tissue indicated malignant melanoma of the forearm. Thus, on January 16, 1970, Dr. Buchwald surgically removed cancerous tissue in the area, finding it to be metastatic malignant melanoma.

Plaintiff commenced this action for medical negligence on February 4, 1971, against The Nicollet Clinic, Dr. Stewart, Dr. Sanchez, and Eitel Hospital.[1] She alleged that Dr. Sanchez was negligent in failing to correctly diagnose in 1967 that the forearm tumor was cancerous, which allowed it to spread to her upper left arm and chest, necessitating the 1970 surgery. At the close of plaintiff's case in chief, the trial court granted defendant's motions for dismissal because plaintiff had failed to prove by expert medical testimony that Dr. Sanchez had departed from the standard of care required of him in diagnosis.[2]

---

[1] On appeal plaintiff does not challenge the trial court's action in dismissing the case against defendants Stewart and The Nicollet Clinic, so their alleged negligence need not be discussed.

[2] The trial court's reasons for granting defendants' motion for a directed verdict are articulated in the memorandum accompanying the order denying plaintiff's motion for a new trial. That memorandum states in part: "However, this Court, even though it may be repetition, does not find any testimony by any of the doctors as to a deviation by Dr. Sanchez from following skillful and accepted medical procedures in arriving at his diagnosis or that he did not adhere to the degree of

We need not recite at length the long list of cases which again and again apply the well-reasoned rule setting out what a plaintiff must establish in a medical malpractice case. In order to prove that defendant doctor was negligent, the burden was upon plaintiff to offer expert testimony establishing (1) the standard of care recognized by the medical community, and (2) that defendant in fact departed from that standard. Swanson v. Chatterton, 281 Minn. 129, 160 N. W. 2d 662 (1968); Silver v. Redleaf, 292 Minn. 463, 194 N. W. 2d 271 (1972).

I.  The problem arises in this case from the fact that two of plaintiff's medical witnesses were asked if they knew or were familiar with the standards for pathological diagnosis in 1967, but when they replied in the affirmative, they were never asked what those standards were. Defendants assert that this constituted a failure to establish the first essential element of a malpractice case, the requisite standard of care. Plaintiff asserts that from an examination of the record, a standard of care for pathological diagnosis in this case can be established from the combined testimony of all of plaintiff's medical witnesses.[3] We

---

skill and the standard of care required of a physician, in this case a pathologist, in making his examination of the sample sent to him by Dr. Stewart, and his examination of the various slides that were made and the method in which his examination was made. True, there is a difference of opinion as to the diagnosis, but there was nothing that the Court felt it could submit to a jury from the standpoint of their determining whether or not Dr. Sanchez was negligent so that he would be guilty of malpractice. There were no questions asked of any of the doctors except as to what their diagnosis was. There was no questioning of the doctors as to whether or not there was a deviation from the accepted manner of conducting such a pathological examination or whether or not the examination was conducted in a negligent manner."

[3] Dr. Ronald Munkittrick; Dr. Aina Galejs; Dr. Sanchez (the defendant doctor was called as a witness under Rule 43.02, Rules of Civil Procedure); Dr. Henry Buchwald, associate professor of surgery at the University Medical School; Dr. Paul Lober, professor and surgical pathologist; Dr. Theodore Grage, associate professor of surgery and director of the University Tumor Clinic.

have carefully read the transcripts furnished us and disagree with this assertion. Briefly summarized, the alleged standard was a compilation of testimony in three areas:

(1)   With regard to the standard operating procedure used by a pathologist in preparing, examining, and diagnosing a tissue sample slide, the testimony sets out a step-by-step process which includes, inter alia, a gross examination of the tissue sample, followed by embedding a portion of the tissue in paraffin for use in slides. A thin slice section is stained and placed under a microscope for examination. The pathologist makes his diagnosis and dictates a tissue report. The standard in this area was not questioned and there was no deviation from it.

(2)   There was also testimony regarding the various recognized indicia of malignant melanoma for which a pathologist will be looking. By the use of enlarged slides, Drs. Grage and Lober testified that the signs of tissue melanoma are the appearance of enlarged, irregularly shaped cells, occasional cell division and migration through the epidermis, and a brownish pigment within the cells.

(3)   Lastly, there was testimony from Dr. Lober that the various indicia just mentioned were taught to medical students as being the common indicators of malignant melanoma. However, the medical experts were not asked if these standards used at the University Hospitals by pathologists in diagnosing malignant melanoma are the same as those followed and relied on by the rest of the medical community. There were questions directed to Dr. Buchwald as to his familiarity with the accepted standards for surgeons in the community in 1967. The standards for surgeons were not tied in to standards for pathologists making a diagnosis from an examination of tissue. It is a fair reading of the record that the standards in the community for pathologists in medical cases such as that of plaintiff were not established.[4] The medical experts were not questioned as to what the

_____

[4] The testimony that comes closest to an answer on this issue reads as follows:

applicable standard of care for making a pathological diagnosis consisted of, nor do we think such standard was indirectly established from the totality of all the testimony.

II. The second essential element of any medical malpractice case—evidence that the particular doctor departed from the required degree of skill and care so as to constitute negligence—is totally missing in this case.[5] The only pertinent question asked

"MR. SULLIVAN: And were you familiar at that time with the accepted standards of surgeons in the community in 1967?

"THE WITNESS [Dr. Buchwald]: I would think so. Our chairman at that time was Dr. Wangensteen, certainly known as one of the world's greatest authorities on cancer surgery.

"MR. SULLIVAN: All right. But I'm curious as to what your experience was other than at the University Hospitals. Had you had experience in any of the community hospitals here at that point?

"THE WITNESS: No.

"MR. SULLIVAN: And you are familiar with the standards at the University Hospital at that time, of course.

"THE WITNESS: Yes.

"MR. SULLIVAN: And these things change in medicine from year to year, of course, don't they, doctor?

"THE WITNESS: I think there is very little difference between standards at the University and at the community level.

"MR. SULLIVAN: All right. But my point is that standards change over the years, and we are talking about a period six years ago.

"THE WITNESS: Yes, standards do change.

"MR. SULLIVAN: And your experience with whatever the standards were in the community were limited to the University of Minnesota Hospitals at that point?

"THE WITNESS: Yes."

The above-quoted testimony is obviously related to standards for surgery and not standards for diagnosis by pathologists. This is even more clear in the context of both prior and subsequent questions and answers relating to the surgery that would be called for in treating a primary lesion of malignant melanoma on a forearm and the surgical treatment that would be used for a compound nevus on the forearm.

[5] If it had been proved that the defendant as a pathologist not only ought to know by reasons of the standards in the medical community the indicators for malignant melanoma, but under the same standards

of any of the doctors was what their diagnoses were of the 1967 slide. Although their opinions that it disclosed malignant melanoma differed from that of Dr. Sanchez, there was no questioning of the doctors as to whether or not there had been a deviation from the accepted manner of conducting such a pathological examination, or whether the examination was conducted in a negligent manner.

Plaintiff asserts that medical testimony was not necessary in this case to show Dr. Sanchez was negligent. She claims that the nature of the alleged negligent conduct was such that the inferences to be drawn from the facts could have been drawn by the jury, since the knowledge of this type of case is within the practical commonsense or common experience of all people. Christy v. Saliterman, 288 Minn. 144, 179 N. W. 2d 288 (1970); Schulz v. Fiegal, 273 Minn. 470, 142 N. W. 2d 84 (1966); 7A Dunnell, Dig. (3 ed.) § 3325.

This position finds no support in the law or in logic. The same is true of plaintiff's assertion that the doctrine of res ipsa loquitur could be applied to let the jury draw an inference of negligence. This is distinctly not the kind of case where the negligence "speaks for itself" without expert medical opinion, such as where a surgeon leaves a sponge in the body or where there is unexplained injury to a healthy part of the body remote from the treatment area.[6] Where, as here, the conduct of the physician involves the complexities of pathological diagnosis, we are not persuaded that nonmedically-trained jurors are competent to

---

ought to be able to always recognize these indicators in examining tissue, no explicit expert testimony would be necessary to show a departure from those standards in this case. Here, experts did testify that they believed such indicators were clearly visible in the slides of the tissue and it follows that there was a departure from their individual standards, but not necessarily from the standards for pathologists in the medical community.

[6] Hestbeck v. Hennepin County, 297 Minn. 419, 212 N. W. 2d 361 (1973); 1 Louisell & Williams, *Medical Malpractice*, § 14.06.

pass judgment. This is definitely not an area within the common knowledge and experience of lay people. Nor is it factually comparable to the case of Harju v. Allen, 146 Minn. 23, 177 N. W. 1015 (1920), where this court held that an error in diagnosis of a broken pelvis was so obvious that the jury had sufficient practical commonsense to enable them to decide whether the diagnosis was negligent absent expert testimony. There was testimony in the present case that would indicate that pathologists do disagree at times about diagnosis of tissue and that pathology is not an exact science. Thus, if a pathologist, in rendering a diagnostic opinion on the basis of his or her skill, training, and experience, says a tissue sample is benign while others say it is malignant, how can we allow juries to say one or the other of the pathologists is negligent in the absence of expert testimony as to the standards for pathologists and as to whether there was a departure from those standards?

In this type of case, courts have consistently held that a physician is liable for malpractice for an error in diagnosis only if such error was due to a lack of required skill or care in making the diagnosis.[7] Negligence cannot be found where the facts show no more than an honest error in diagnosis.[8] Since diagnosis is usually a matter of professional judgment, injury in such a case may be the result of an error in judgment rather than negligence. Because jurors are not sufficiently knowledgeable to decide themselves between an error in judgment and negligence in the kind of case before this court, expert medical testimony is needed to render an opinion as to whether the physician did live up to the standard of care required.

---

[7] Booth v. United States, 155 F. Supp. 235 (Ct. Cl. 1957), no negligence in failing to diagnose cancer; Jeanes v. Milner, 428 F. 2d 598 (8 Cir. 1970), no negligence in failure to diagnose cancer of the throat; Skeffington v. Bradley, 366 Mich. 552, 115 N. W. 2d 303 (1962); 1 Louisell & Williams, *Medical Malpractice,* §§ 4.05 and 4.08.

[8] This court has said that a physician is not responsible for the consequences of an honest mistake or error in judgment in his diagnosis or treatment. Silver v. Redleaf, 292 Minn. 463, 194 N. W. 2d 271.

The plaintiff has failed to establish the standards in the medical community for diagnosis of malignant melanoma by pathologists or that Dr. Sanchez departed from such standards. The standards for diagnosing malignant melanoma have not become a matter of common knowledge. We therefore sustain the order of the lower court.

Affirmed.

MR. JUSTICE OTIS took no part in the consideration or decision of this case.