Joseph SANDHOFER, Respondent,

v.

The ABBOTT–NORTHWESTERN HOS-
PITAL, Appellant, Respondent,

Keith D. Millett, M.D., et al.,
Respondents, Appellants.

Nos. 48526, 48548.

Supreme Court of Minnesota.

July 13, 1979.

Mahoney, Dougherty & Mahoney and Thomas E. Dougherty, Minneapolis, for Abbott-Northwestern Hospital.

Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan and O. C. Adamson II and M. J. Coyne, Minneapolis, for Millett & Schaffhausen.

Fitzgerald & Crandall and William A. Crandall, Minneapolis, for respondent.

Heard before TODD, WAHL and KENNEDY, JJ., and considered and decided by the court en banc.

WAHL, Justice.

This is a medical malpractice action arising from the treatment of plaintiff's fractured right wrist, which allegedly resulted in the eventual loss and amputation of the forearm and hand. By special verdict, the jury sitting in Hennepin County District Court found plaintiff 10 percent negligent, defendant Abbott-Northwestern Hospital 60 percent negligent, and defendants Drs. Millett and Schaffhausen each 15 percent negligent, and assessed $325,000 in damages. All defendants unsuccessfully moved the trial court for judgment notwithstanding the verdict or for a new trial. This appeal was taken only on the issue of liability. We affirm.

Late in the afternoon of June 22, 1974, plaintiff accidentally fell from a ladder on which he was standing while installing a gutter and landed on the ground, injuring his right wrist. After wrapping his wrist and applying ice, plaintiff's wife, a registered nurse, drove plaintiff to defendant Abbott-Northwestern Hospital (Hospital), where they had arranged to meet defendant Dr. Millett. Dr. Millett's examination revealed a comminuted, or shattered, fracture of the wrist. Dr. Millett surgically reduced the fracture, removed most of the bluish gutter seal covering plaintiff's hand, and applied a circular plaster cast from above plaintiff's elbow to his knuckles. According to plaintiff, defendants' negligence in treating his injury occurred in the period between the application of the cast and the

splitting of the cast 5 days later. During this period circulation in the hand and arm allegedly was impaired, causing a necrotic condition that necessitated amputation of the arm several months later.

When the cast was applied, Dr. Millett observed good circulation in the hand. After the cast was in place, plaintiff experienced considerable discomfort and pain. Dr. Millett ordered the staff to apply ice packs and to monitor plaintiff's pulse, temperature, respiration, blood pressure, and circulation in the fingers. To check circulation, the doctors and nurses "blanched" the fingernails of plaintiff's injured hand, which means that pressure was first applied to the nail, forcing blood out of the area so that the return of blood could then be observed. Although Dr. Millett ordered and assembled an overhead sling to provide elevation for the arm, the arm was supported instead on pillows much of the time because of the pain.

During his hospitalization, plaintiff was treated by both Drs. Millett and Schaffhausen. The condition of his arm was periodically observed by the nurses and aides and was recorded in their notes over the 5-day period. On the night of admission, the notes described plaintiff's right fingers as bluish and slightly cool. The next evening, June 23, the fingers were described as very blue, cool, and swollen. This condition persisted until the afternoon of the next day, June 24, when the color and sensation in the right hand were described as good. That evening, however, the fingers were again edematous (swollen) and cyanotic (bluish). By June 25, some of the nurses had become concerned over the condition of plaintiff's fingers. That afternoon, a nurses' aide observed the hand and fingers to be swollen and dark blue. Although the charge nurse and doctors expected to be notified of significant changes, they were not notified. The entries for the next day describe the hands and fingers as swollen and bluish. That night the fingers were bluish and cool, a condition that continued until the next noon when the cast was split. After the cast was split the color improved and the fingers were warmer.

The cast was split after Dr. Millett was summoned to the hospital by a nurse who was concerned about the appearance of plaintiff's hand. Dr. Millett, who opened the cast, testified that the arm was normally pink and circulation was good at that time. His notes, however, indicate ischemia (impaired circulation) of the hand. Plaintiff testified that the arm was as hard as a baseball bat and that chunks of his arm were taken out as the cast was spread. According to the medical testimony, such hardness could indicate ischemia. A nurse and nurses' aide testified that they observed sores on the arm, which the nurse stated was unusual. The top half of the cast was replaced and reattached to the arm by Ace bandages. Plaintiff was then issued a sling to be worn around the neck.

Plaintiff remained in the hospital until July 14, when he discharged himself against Dr. Millett's advice. His arm was in a short-arm cast, below the elbow, which had been applied on July 11. Between July 15 and July 24, plaintiff was engaged in activities involving manual labor, such as sweeping, lifting, and driving a van to and from the building where he was working. On July 24, plaintiff returned to the hospital complaining of considerable pain. Dr. Millett's examination revealed a displacement of the fracture and an open ulcer on the forearm. After surgery, plaintiff was diagnosed as suffering ischemic necrosis. On September 24, plaintiff consulted Dr. James House at the University of Minnesota Hospital, who advised and performed amputation of the arm just below the elbow.

■ Defendants argue on several grounds that the trial court erred in refusing to enter judgment notwithstanding the verdict in their favor or to grant a new trial on the question of liability. On an appeal such as this we review the entire evidence before the trial court to determine whether there is any competent evidence reasonably tending to sustain the verdict. Unless the evidence is practically conclusive against the verdict, we will not set the verdict aside. See, *Parkside Mobile Estates v. Lee*, 270 N.W.2d 758, 761 (Minn.1978).

1. Defendants initially argue that the testimony of plaintiff's expert witness rested upon an inadequate and unreliable factual foundation and should not have been permitted to form the basis of the jury verdict. Plaintiff was required to offer expert testimony establishing the applicable standard of care recognized by the medical community and the departure from that standard by defendants. See, *Todd v. Eitel Hospital*, 306 Minn. 254, 257, 237 N.W.2d 357, 359 (1975). Plaintiff presented the testimony of Dr. James House, an orthopedic surgeon at the University of Minnesota Hospital, who diagnosed the necrotic condition of plaintiff's arm and performed the amputation. Preliminary to giving his opinion, Dr. House testified that in connection with his examination of plaintiff in September 1974, he obtained direct information regarding the treatment administered by defendants from plaintiff, from Dr. Schaffhausen, and from the hospital records. Based on these facts, the trial court properly found that the foundation requirements for the opinion testimony were satisfied.[1]

Dr. House's opinion was then presented within the context of a hypothetical question. When this method is used, the hypothetical must include substantially all of the undisputed material facts relating to the subject and disputed facts which have some clear support in the record. *Grapentin v. Harvey*, 262 Minn. 222, 114 N.W.2d 578 (1962). The hypothetical question submitted to Dr. House met this standard. Assumptions were stated as to the nature of the accident, satisfactory reduction of the fracture, application of a particular type of cast, all of the information contained in the nurses' notes for the period of June 22 to June 27, the fact that plaintiff periodically removed his arm from the sling prescribed by Dr. Millett but kept it elevated on pillows, and the fact that no doctor's notes existed for June 24, 25, and 26.

We find no indication that any significant incorrect or incomplete data was supplied to Dr. House. If minor inaccuracies were demonstrated to be present in the hypothetical question, the trial court had the discretion to rule on the validity of the question as a whole. *Grapentin v. Harvey*, *supra*. In the instant case the trial court found the question to be valid, overruling defendant's objections to foundation. We find no abuse of discretion in that ruling. Moreover, we note that defendants took ample care in cross-examination and in final argument to discredit and qualify Dr. House's testimony.

2. The next issue raised by defendants is whether it was error for the trial court to refuse to give certain jury instructions that were requested by defendants. The trial court refused to give the following instruction, requested by defendants Millett and Schaffhausen:

"In this regard, it is permissible for an expert witness to testify to various possibilities as to what may have happened. However, the testimony concerning possibilities may not be considered by you unless the expert witness has testified that, in his opinion, one of such possibilities is the probable one, that is, that the probability rests with one of them."

On the ground that a general charge on the burden of proof was sufficient, the trial court also refused to give the following instruction requested by defendants:

"The plaintiff, in a malpractice action has the burden of proving that there was negligence by defendant doctor and that such negligence was the cause of the in-

---

1. These facts were sufficient under Rule 703 of the Minnesota Rules of Evidence, which provides:

   "Bases of Opinion Testimony by Experts. The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the partic-

ular field in forming opinions or inferences on the subject, the facts or data need not be admissible in evidence."

It has been suggested that an adequate foundation is established if the facts and data are of a type reasonably relied upon by experts in the field. See, Minnesota Rules of Evidence, Rule 703, Committee Comment.

jury complained of, in this regard proof of causation in a medical malpractice case cannot rest on conjecture and the mere possibility of such causation is not enough to sustain plaintiff's burden of proof, such burden of proof has to be something more than that which is consistent with plaintiff's theory of how the injury happened and plaintiffs are required to show that it is more probable that the harm resulted from some negligence for which defendant doctor is responsible rather than from some other cause or some other person's negligence."

■ We have held that a jury charge is sufficient if it fairly lays down the law of the case and conveys a clear and correct understanding of the law to the jury. See, *Cameron v. Evans*, 241 Minn. 200, 62 N.W.2d 793 (1954). We prefer general charges, where practical, in order to avoid overemphasis of one side of the case and jury confusion. *Cameron v. Evans, supra.* See, *Manion v. Tweedy*, 257 Minn. 59, 100 N.W.2d 124 (1959). If it soundly appears that a more specific instruction on a particular issue is necessary to enable the jury to intelligently determine the question, the trial court should observe the party's request. *Hagen v. Snow*, 244 Minn. 101, 69 N.W.2d 100 (1955). Furthermore, a party is entitled to a specific instruction on his theory of the case if there is evidence to support the instruction and it is in accordance with applicable law. *Cornfeldt v. Tongen*, 262 N.W.2d 684, 698 (Minn.1977). In any event, the trial court has broad latitude in determining the propriety of a specific instruction. *Cameron v. Evans, supra.*

■ In this case, we find that the general charge given by the trial court for each defendant was adequate:

"Was his negligence, that is Dr. Millett's, a direct cause of Plaintiff's injury? Now, let me tell you and go over what direct cause, define direct cause for you. A direct cause is a cause which had a substantial part in bringing about the injury either immediately or through happenings which followed one after another; and in conjunction with that, I want to read to you something called

Concurring Cause. There may be more than one direct cause of an injury. When the effects of negligent conduct of two or more persons, or a person or a force of nature actively working at the same time to cause the injury, each may be a direct cause of the injury * * *.

"Now, the burden of proof is again on Mr. Sandhofer by a fair preponderance of the evidence, to prove that Dr. Millett, if you find he was negligent, that his negligence was a direct cause of the injury."

Defendants did not demonstrate the need for a more specific instruction on the proof of causation.

■ Defendant hospital also challenges the trial court's refusal to instruct the jury that it could not infer from the evidence that the cast would have been split immediately upon notification of the doctors of a significant change in the color of plaintiff's fingers and hand. In light of the testimony that the standard of care would require the nurses to inform the doctors upon observation of circulatory impairment and that when the signs of circulatory impairment are evident the cast must be split or removed, the trial court's ruling was not in error.

■ 3. Defendants next raise several challenges to the sufficiency of the evidence. Defendant hospital argues that the evidence cannot support a finding that the staff's negligence was a direct cause of plaintiff's injury. We find no merit to this argument. Dr. House testified that in his opinion the failure of the nurses to notify the doctors of significant, observable changes in plaintiff's condition was a direct cause of plaintiff's injury. Whether or not to accept that expert opinion of causation is an issue for the jury, and if the jury chooses to believe an expert whose opinion has a reasonable basis in fact, the decision of the jury will not be overturned. See, *Shymanski v. Nash*, 312 Minn. 304, 251 N.W.2d 854 (1977); *Bernloehr v. Central Livestock Order Buying Co.*, 296 Minn. 222, 208 N.W.2d 753 (1974).

Defendant hospital also argues that its negligence, if any, was superseded by the negligence of the doctors. The jury was not instructed on the law of superseding or intervening negligence, rather on concurring cause. No instruction on superseding negligence was requested at trial. When the issue was raised after the trial, the trial court ruled that superseding or intervening cause did not apply to this fact situation. We agree and find no error.[2]

Also, as a matter of sufficiency of the evidence, the hospital challenges the jury's apportionment of negligence. Apportionment of negligence is the function of the jury. See, *Lamke v. Louden*, 269 N.W.2d 53, 56 (Minn.1978); *Steinhaus v. Adamson*, 304 Minn. 14, 20, 228 N.W.2d 865, 869 (1975); *Riley v. Lake*, 295 Minn. 43, 58, 203 N.W.2d 331, 340 (1972). Unless the verdict is manifestly and palpably contrary to the evidence, it will not be set aside. In the present case sufficient evidence of negligence on the part of the doctors and the hospital was submitted to the jury. While the evidence might also have supported a finding that the doctors' negligence in detecting ischemia and the failure to timely split the cast exceeded the hospital's negligence in observing plaintiff's condition and notifying the doctors, we cannot say that the jury's decision to the contrary is unfounded in the evidence.

4. Finally, defendants argue that the trial court abused its discretion in refusing to permit defendant doctors to call an expert witness who was not listed as a potential witness in their Statement of the Case, as required by Rule 28 of the Special Rules of the Fourth Judicial District.[3] In ruling against the doctors, the trial court cited their noncompliance with Rule 28, noting that plaintiff had been unable to depose the expert because of nondisclosure. Although the expert was present in the courtroom during the trial and on the first day

---

**2.** In *Kroeger v. Lee*, 270 Minn. 75, 78, 132 N.W.2d 727, 729 (1965), we set out the four elements of intervening cause: (1) its harmful effects must have occurred after the original negligence; (2) it must not have been brought about by the original negligence; (3) it must actively work to bring about a result which would not otherwise have followed from the original negligence; and (4) it must not have been reasonably foreseeable by the original wrongdoer.

Two additional considerations exist. The question of intervening cause shall be submitted to the jury only when there might be a reasonable difference of opinion as to the foreseeability of the intervening act. *Strobel v. Chicago, Rock Island & Pacific R. Co.*, 255 Minn. 201, 208, 96 N.W.2d 195, 201 (1959). Furthermore, intervening cause will not relieve the original wrongdoer if a continuing duty toward the plaintiff existed in spite of the second wrongdoer. *Mikes v. Baumgartner*, 277 Minn. 423, 430, 152 N.W.2d 732, 737 (1967). Here, the fact that the hospital's duty continued towards plaintiff for as long as he stayed in the hospital, the fact that the doctors' negligence was foreseeable, the possibility that the doctors' negligence was brought about by the hospital staff's negligent failure to notify them in a timely fashion, and the possibility that the hospital's negligence could have had the same resulting injury even without the doctors' negligence preclude application of the doctrine of intervening cause to these facts. Thus, the trial court was correct to instruct the jury on the law of concurring cause.

**3.** Rule 28(E)(c) of the Special Rules of the Fourth Judicial District requires pretrial disclosure of all potential witnesses:

"E. The form of the written statement of the case shall be as follows:

"Except in dissolution proceedings, at the time of filing the Note of Issue—Readiness for Trial there shall be served and filed a written statement of the case, including to the extent applicable, the following:

\* \* \* \* \* \*

"c. Names and addresses of all witnesses known to attorney or client who may be called at the trial by the party, including doctors and other expert witnesses."

The consequences of noncompliance with this provision are set forth in Rule 28(L)(V):

"V. Agreements reached and orders made at the pretrial or settlement conference shall control the subsequent course of proceedings. Witnesses not named or exhibits not identified in the statements of the case or during the pre-trial or settlement conference shall not be presented at the trial except to prevent manifest injustice, unless the need for or identity of such witness or exhibit is ascertained subsequent to the pretrial or settlement conference. In the latter event, opposing counsel and the Court shall be notified immediately. The Court may, in appropriate cases, make final determinations relating to a case at a pre-trial conference."

defendants announced their intent to call him, it does not appear that a reasonable opportunity to depose the expert during the trial was offered to plaintiff.

Most significantly, defendants did not show circumstances that excused noncompliance with the rule. The doctors' attorney argued that the need for an expert was not known prior to trial. He had not discussed defendant doctors' case with an expert prior to trial, claiming that he could not do so until he had determined what issues would arise in the trial. Plaintiff's attorney maintained, however, that the issues were clear, citing the facts that plaintiff's expert, Dr. House, was deposed on October 29, 1975, that on December 13, 1976, defendants were informed by letter that Dr. House believed that the relevant standard of care required splitting of the cast and that, based on information known to him, there was a departure from the standard. Furthermore, on April 8, 1977, the parties stipulated in writing that discovery would cease 30 days prior to trial. Subsequently, plaintiff's counsel requested the names of defense witnesses on two separate occasions.

In reviewing these circumstances, we find no abuse of discretion in the exclusion of the testimony of Dr. Jones. In *Cornfeldt v. Tongen, supra,* we cautioned trial courts from readily excluding expert testimony in malpractice cases for inadvertent failure to disclose that testimony during discovery. The case at hand, however, is distinguishable. First, the facts before us indicate that failure to disclose was not inadvertent, rather it was deliberate and tactical. While the practice of delaying selection of an expert witness until commencement of trial may have certain strategic value, it conflicts with the open discovery policy embodied in the Minnesota Rules of Civil Procedure and the Special Rules of the Fourth Judicial District. The doctors were able to select a doctor to be present during plaintiff's case in chief. That expert could have been listed as a potential witness in response to the numerous discovery inquiries. Thus, the kind of inadvertence observed in *Cornfeldt* is lacking in the case at hand.

We note also that the *Cornfeldt* case was tried in Ramsey County, the Second Judicial District, without the benefit of a special rule similar to Rule 28 requiring pretrial disclosure of potential witnesses. If a local rule exists, we have, when reasonable, given it special weight. See, e. g., *Freeburg v. Lillydale Grand Central Corp.,* 284 Minn. 388, 170 N.W.2d 330 (1969). The instant case is on point with Freeburg where we found no abuse of discretion in the exclusion of expert testimony where not disclosed under Rule 28. We stated:

"Although exclusion of evidence is a drastic remedy, it seems clear that this is an area in which the trial judge is accorded discretion and his decision will be reversed only for an abuse of that discretion. [Citations omitted.] This is particularly true where the court's action is based on a special rule of the judicial district in which the case was tried." 284 Minn. 393, 170 N.W.2d 334.

Several considerations underlay our decision in *Freeburg.* First, no amount of investigation would have revealed the existence of the expert or the nature of his testimony. Second, prior to trial, no indication of intention to call other experts was given. Last, the impact of an expert on the jury is so great that allowing testimony of an expert without advance notice to the other party could work a substantial injustice. 284 Minn. 393, 170 N.W.2d 334. These same considerations are compelling here. Although we do not treat lightly the exclusion of testimony that could well affect the outcome of the case, we recognize that the purpose of the special rule is sound. Thus, we conclude, as did the trial court, that absent a satisfactory showing of special circumstances excusing noncompliance, the rule should be enforced.

Affirmed.

SHERAN, C. J., and OTIS, J., took no part in the consideration or decision of this case.