Kristian **OUELLETTE**, a minor, by Frank **OUELLETTE**, his father and natural guardian, and Frank Ouellette, individually, Respondents,

v.

Barbara H. **SUBAK** and Maxine O. **Nelson**, Appellants.

No. C4–85–571.

Court of Appeals of Minnesota.

Dec. 17, 1985.

Review Granted Jan. 31, 1986.

Reed K. Mackenzie, Mark Hallberg, Minneapolis, for respondents.

Jerome C. Briggs, Charles E. Lundberg, Minneapolis, for appellants.

Heard, considered and decided by the court en banc, consisting of POPOVICH, C.J., and PARKER, FOLEY, WOZNIAK, HUSPENI, FORSBERG and NIEREN-GARTEN, JJ.

## OPINION

FOLEY, Judge.

Respondents sued Dr. Barbara H. Sudak, Dr. Maxine O. Nelson, Dr. John N. Maunder and Dr. John T. Moehn in a medical malpractice action. After discovery, the claims against Dr. Maunder and Dr. Moehn were voluntarily dismissed. Following a four-day trial, a special verdict was returned finding Drs. Subak and Nelson negligent in the care and management of Julie Ouellette's pregnancy, that such negligence by Drs. Subak and Nelson was a direct cause of injury or damage to Kristian Ouellette, and that Kristian Ouellette's damages were $1 million. The trial court entered judgment on the jury's special verdict, plus interest and costs. The trial court denied appellants' motions for judgment notwithstanding the verdict and for a new trial. On appeal, appellants claim the trial court erred in refusing to instruct the jury on the honest error in judgment rule. In addition, they challenge the sufficiency of evidence on negligence and causation, and challenge the qualifications of Dr. Stephen Smith, a pediatric neurologist, to testify as to causation. We reverse and remand.

## FACTS

Julie Ouellette, a 20-year old suspecting her first pregnancy, visited Dr. Subak on March 11, 1977. The pregnancy test was positive and Dr. Subak took a history from the patient from which she established an "estimated date of confinement," or due date, of October 12, 1977. The baby, Kristian Ouellette, was delivered by Cesarean section on December 1, 1977, and has significant brain damage.

Dr. Subak began to question the due date, as established by the patient's history, as the pregnancy progressed. She noted that a fetal heart tone, which should have been heard at 18 weeks, was not heard until June 10, at 22 weeks. On September 8, Dr. Subak determined that the fetus was still floating and not engaged in the pelvis as it should be four weeks before the due date. The same finding was noted

on September 28. On October 7, Dr. Subak ordered x-rays of the pelvis (x-ray pelvimetry) which showed that Mrs. Ouellette had an adequate pelvis for normal birth, but showed no evidence of any femoral epiphysis on the distal femur of the fetus which should be visible by 35 weeks. Based on all this information, Dr. Subak presumed that the initial due date was incorrect by about four weeks.

On October 17, another examination by Dr. Subak showed that, while the cervix was softening, a sign that the patient might be preparing for labor, the head of the fetus, which should have been engaged, was barely into the pelvis.

On October 25, the patient was seen by Dr. Nelson, an associate of Dr. Subak. Dr. Nelson testified that the cervix was still soft, but closed, and the head was at the same station. The same findings were made on November 2 by another associate, Dr. DeAngelis.

On November 9, Dr. Subak, concluding that labor was not imminent, sent Mrs. Ouellette to Metropolitan Medical Center for induction of labor and an Oxytocin Challenge Test (OCT), a test of fetal well-being which is conducted along with intravenous induction.

At the hospital, Dr. Subak sought a consultation with an obstetrician, Dr. Maunder, who examined the patient and recommended she be induced very cautiously. The OCT is conducted by inducing labor contractions while monitoring the fetal heart tones. The OCT is designed to assess the well-being of a fetus in utero and determine if it may remain in the uterus another week. Results for Mrs. Ouellette were normal, or negative for fetal distress, on November 9 and on the 10th, when induction was resumed. Induction did not lead to labor, and Mrs. Ouellette was sent home. An OCT was again performed on November 17, and was negative. On November 25, Dr. Nelson examined Mrs. Ouellette. She observed some softening of the cervix and that the fetus' head was still floating.

On November 30, Dr. Subak saw the patient and admitted her for an OCT and induction of labor. Dr. Nelson, who was on duty that night, visited Mrs. Ouellette, who was making no progress towards labor, and requested a consultation with an obstetrician, Dr. Moehn. Dr. Moehn examined Mrs. Ouellette and decided that the baby should be delivered by Cesarean section because the baby was large and floating and labor could not be induced.

The Cesarean section was performed the following morning by Dr. Moehn's partner, Dr. Pincus. Dr. Pincus testified that the baby did not have signs of post-mature syndrome, that there were no abnormalities in the placenta, and that there was no meconium in the amniotic fluid (which often indicates and accompanies fetal distress). In contrast, the Ouellettes testified that they were told by hospital personnel that the amniotic fluid was meconium stained.

Kristian Ouellette was given an Apgar score, based on five indicators of well-being, of eight at one minute and eight at five minutes. All the expert witnesses agreed that these were very good ratings. The anesthesiologist, however, recorded an Apgar of four at one minute. In addition, the Ouellettes testified that Kristian was "grayish" or "dusky" right after birth, that he had long fingernails and toenails, and wrinkly, dry and scaly skin—all signs of post-mature syndrome. He lost weight after birth, which his attending pediatrician, Dr. Lund, testified was typical of overdue babies.

Expert witnesses testified for both sides on the medical issues, which included estimation of the due date, tests indicated to determine fetal well-being and fetal maturity in utero, signs of placental insufficiency, and the cause of Kristian Ouellette's brain damage.

The trial court gave the following instruction on the standard of care applicable to a physician:

In performing professional services for a patient, a physician must use that degree of skill and learning which is nor-

mally possessed and used by physicians in good standing in a similar practice and under like circumstances.

In the application of this skill and learning, the physician must also use reasonable care.

The fact standing alone that a good result may not have followed from the treatment by a physician is not evidence of negligence or unskilled treatment.

See JIG II, 425 G–S (2d ed. 1974). The trial court denied appellants' request to give the remainder of JIG II, 425 G–S, which reads as follows:

A [physician] is not a guarantor of a cure or a good result from his treatment and he is not responsible for an honest error in judgment in choosing between accepted methods of treatment.

Id. The appellants objected to this omission and assigned it as error in their post-trial motions. The trial court gave no reason for its denial of the requested instruction.

The jury returned a special verdict finding both appellants negligent and awarding damages of $1 million.

## ISSUE

Did the trial court err in refusing to instruct the jury that a physician is not liable for an "honest error in judgment"?

## ANALYSIS

Appellants contend that the "honest error in judgment" language is mandated by Minnesota case law and squarely supported by the evidence here. They argue that an exercise of professional judgment was required to decide whether to accept the due date set by oral history or to follow the clinical findings indicating that the date was as much as four weeks later. Respondents argue that the "honest error" language is not required to fully state the standard of care and therefore its omission here was not error.

The "honest error in judgment" instruction has been approved in a long line of Minnesota cases. See e.g. Todd v. Eitel Hospital, 306 Minn. 254, 261, 237 N.W.2d 357, 361–62 (1975); Silver v. Redleaf, 292 Minn. 463, 194 N.W.2d 271 (1972); Gamradt v. DuBois, 180 Minn. 273, 230 N.W. 774 (1930); Berkholz v. Benepe, 153 Minn. 335, 190 N.W. 800 (1922); Staloch v. Holm, 100 Minn. 276, 111 N.W. 264 (1907).

Some jurisdictions have discarded the "honest error in judgment" language. One view is that the language is potentially misleading and exculpatory. Wall v. Stout, 310 N.C. 184, 311 S.E.2d 571 (1984). Others view the language as conflicting with the "ordinary care" language so as to suggest a disjunctive standard of care excusing a physician from departures from ordinary medical care if made in good faith. Teh Len Chu v. Fairfax Emergency Medical Associates Ltd., 223 Va. 383, 290 S.E.2d 820 (1982); see also Logan v. Greenwich Hospital Association, 191 Conn. 282, 465 A.2d 294 (1983) ("bona fide error in judgment" language serves only to confuse the jury).

The Minnesota Supreme Court has rejected this criticism, at least as to the record in the case before it:

There is no indication in the record that members of the jury were confused by the terms "honest" and "judgment" or believed they had to find dishonesty by defendants in order to find them guilty of malpractice.

Kinning v. Nelson, 281 N.W.2d 849, 853 (Minn.1979).

The supreme court has established the following standard for the adequacy of an instruction to the jury:

[A] new trial will not be granted where requested instructions are refused when the general charge fairly and correctly states the applicable law. All that is required is that the charge as a whole convey to the jury a clear and correct understanding of the law.

Cameron v. Evans, 241 Minn. 200, 208–09, 62 N.W.2d 793, 798 (1954) (footnotes omitted).

The instruction given here was not sufficient to state the standard of care applicable to a physician. The law has long

recognized the importance of professional judgment in matters of medical diagnosis and treatment. *See, e.g., Staloch v. Holm,* 100 Minn. 276, 281, 111 N.W. 264, 266 (1907). The supreme court more recently has stated, regarding a claim of misdiagnosis: ·

Negligence cannot be found where the facts show no more than an honest error in diagnosis. Since diagnosis is usually a matter of professional judgment, injury in such a case may be the result of an error in judgment rather than negligence. Because jurors are not sufficiently knowledgeable to decide themselves between an error in judgment and negligence in the kind of case before this court, expert medical testimony is needed to render an opinion as to whether the physician did live up to the standard of care required.

*Todd v. Eitel Hospital,* 306 Minn. 254, 261, 237 N.W.2d 357, 361–62 (1975) (footnote omitted); *see also Manion v. Tweedy,* 257 Minn. 59, 70, 100 N.W.2d 124, 132 (1959) (test including "honest error" language followed consistently throughout Minnesota decisions).

The consistent adherence by the supreme court to the "honest error" language in medical malpractice cases, and the inclusion of the instruction in JIG II, 425 G–S (2d ed. 1974), should refute the contention of the dissent that the requested instruction is negative in nature. We note as well that the rule is also followed in attorney malpractice cases. *See Cook v. Connolly,* 366 N.W.2d 287, 292 (Minn.1985) ("[W]e believe the well-established rule protecting a professional against honest errors in judgment needs to be carefully considered.") *See also* JIG II, 429 G–S (2d ed. 1974).

The expert testimony established that the estimated date of confinement (EDC) or due date, is not accepted as wholly reliable. Clinical findings, such as fetal heart tones at 18 weeks, can suggest an actual due date that is much later than that initially established by history.

[A physician] is not responsible for the consequences of an honest mistake or error of judgment in his diagnosis or treatment where there is doubt as to what should be done in accordance with recognized authority and current good practice. These principles are so clearly set forth in previous decisions of this court that no discussion is now called for.

*Berkholz v. Benepe,* 153 Minn. 335, 337, 190 N.W. 800, 800 (1922) (citations omitted).

Here, Mrs. Ouellette failed to go into labor at the initially established due date or any time before the Cesarean section on December 1. From the expert testimony, it was adduced that a normal pregnancy is charted as 40 weeks, but only four percent of babies are born on their due date. Most births occur between 38 and 42 weeks. However, ten percent of deliveries occur after the 42nd week.

■ Here, Dr. Subak testified that her physical observations, the date fetal heart tones were first recorded, an x-ray pelvimetry, and the OCT of November 9 and 10, indicated the fetus was approximately 39 weeks on November 10. Dr. Subak attempted to induce labor on November 9–10 but was unsuccessful, and Mrs. Ouellette was sent home. Based on a consultation with an obstetrician, Dr. Subak decided to continue the weekly OCT to determine the well-being of the fetus and sufficiency of the placenta—relying on favorable test results as an indication that the fetus could remain in utero another week. There was also the possibility the OCT would induce labor. Mrs. Ouellette was admitted again on November 30 for an OCT and induction of labor by pitocin. When labor did not progress, a Cesarean section was performed by an obstetrician the following morning.

Respondents' expert, Dr. Clarence Davis, of San Diego, California, testified that additional tests should have been performed when the patient's pregnancy reached 42 weeks based on the initially established EDC, or due date. These tests included amniocentesis, non-stress tests and estriol studies to determine if the baby was post-

term or ready to be delivered, and that the initial due date should have been considered as reliable here. Dr. Davis stated that labor should have been induced and, if unsuccessful, a Cesarean section performed sometime during or shortly after the 43rd week—sometime during the first week of November in this case.

From the evidence, the jury could have found that in 1977 alternative methods existed for diagnosing and treating a pregnancy that has continued past the EDC or due date, or that appellants made an honest mistake in judgment or treatment—not a negligent one.

> [A] physician is not required to insure the successful outcome of his treatment, nor can he be held liable for honest mistakes of judgment where reasonable doubts and uncertainties as to the proper course of treatment exist. Liability rests upon proof of negligence judged by the standard of whether or not the physician brought and applied to the case at hand that degree of skill, care, knowledge, and attention ordinarily possessed and exercised by other physicians under like circumstances in the same or a similar locality.

*Fritz v. Parke Davis & Co.*, 277 Minn. 210, 213, 152 N.W.2d 129, 131 (1967) (footnote omitted).

Here the evidence presented a very close question of negligence. In addition, obstetrical causation of the baby's brain damage was hotly contested. Proper and full instruction as to the duty of care of the physician in this case was thus of critical importance. A trial court's charge to the jury must likely or reasonably convey to the jury an accurate understanding of the law, or reversal is required. *Malik v. Johnson*, 300 Minn. 252, 259, 219 N.W.2d 631, 636 (1974). In *Chacos v. State Farm Mutual Automobile Insurance Co.*, 368 N.W.2d 343 (Minn.Ct.App.1985), *pet. for rev. denied*, (Minn. August 19, 1985), we found the failure to properly instruct the jury on the relevant law required a new trial, stating:

In *Hagen v. Snow*, 244 Minn. 101, 69 N.W.2d 100 (1955), the court said:

> [E]ven a request for an instruction which is not entirely perfect may in some situations impose upon the court the duty to give a more specific instruction on a particular issue, where it soundly appears that such an instruction is needful to enable the jury to intelligently determine the question. *Id.* at 106, 69 N.W.2d at 103 (quoting *Chicago & N.W. Ry. Co. v. Green*, 164 F.2d 55, 61 (8th Cir.1947)) * * *. Under the circumstances, the trial court's failure to correct and give the proposed instruction was prejudicial error, and we therefore order a new trial.

*Id.* at 347. The trial court's refusal to instruct the jury on the honest error in judgment rule, a rule of law in Minnesota since at least 1907, conveyed an erroneous view of the standard of care applicable to a physician.

In addition, we note that appellants were prevented from arguing their theory of the case to the jury because the court cautioned the attorneys not to discuss anything which was not covered by the instructions. A party is entitled to instructions setting forth its theory of the case. This should be particularly true in this case where there was evidence to support giving the requested instruction and that instruction was in accord with applicable law. *See Kalsbeck v. Westview Clinic*, 375 N.W.2d 861 (Minn.Ct.App.1985); *Lhotka v. Larson*, 307 Minn. 121, 125 n. 7, 238 N.W.2d 870, 874 n. 7 (1976); *Poppenhagen v. Sornsin Construction Co.*, 300 Minn. 73, 81, 220 N.W.2d 281, 286 (1974); *See also State v. Mickelson*, 378 N.W.2d 17 (Minn.Ct.App. 1985). In *Sandhofer v. Abbott-Northwestern Hospital*, 283 N.W.2d 362, 367 (Minn. 1979), the Minnesota Supreme Court said:

> If it soundly appears that a more specific instruction on a particular issue is necessary to enable the jury to intelligently determine the question, the trial court should observe the party's request. *Hagen v. Snow*, 244 Minn. 101, 69 N.W.2d 100 (1955).

There are times when the court may refuse to give a particular instruction but permit the attorneys to discuss that particular law in their final arguments. *See Fallin v. Maplewood-North St. Paul District No. 622*, 362 N.W.2d 318, 322 (Minn. 1985). However, in this case the court cautioned the attorneys not to discuss in their final arguments anything which was not covered by the instructions. Thus, the defense attorney was deprived of the opportunity to fully discuss his theory of the case from the perspective of the standard of care set out in the Jury Instruction Guide under the "honest error of judgment" rule.

The jury could not reasonably understand from the instruction given that an honest error in judgment could relieve the physician of negligence. The jury should have been given that instruction or, at the very least, the attorneys should have been told they were free to fully argue the evidence from the honest error of judgment perspective. The requested instruction was crucial to the appellants' case on liability.

The record reflects that on Friday, October 26, 1984, during an in-chambers discussion on the requested instruction, appellants' counsel stated:

In my opinion instruction number 13 is an improper modification of JIG 425. It specifically leaves out the statement that a doctor is not a guarantor of a cure or of the result from his treatment and is not responsible for an honest error in judgment in choosing between acceptable methods of treatment.

I explained to the Judge that this specific case fits right into that specific statement in JIG in that hypothetically if the jury believes that the pregnancy went to 47 weeks, then I can argue reasonably that it was an honest error in judgment based on Doctor Subak and Doctor Nelson's belief that the fetal heart tones were at 22 weeks, that the floating vertex, the femoral epiphyseal issue and the firm cervix at or near alleged term and also that the mother was not physically ready for delivery at the alleged term.

And therefore this, I believe, is the very sentence which was intended to cover the case we have here, and I will be prohibited from arguing that and I consider that contrary to the law which I have given the Court. And I rely on the Fritz, F-R-I-T-Z, versus Park Davis and Company, 277 Minnesota 210 and Silver versus Red Leaf, 292 Minnesota 463. And also Todd versus Eitel Hospital, 306 Minnesota 253.

Again in chambers on Monday, October 29, 1984, just prior to final arguments and in discussions with the attorneys, the trial court stated:

The record may show that I have indicated to counsel the instruction that will be given with reference to the duty of a doctor is JIG 425 minus the last sentence. Mr. Briggs' objection is to the failure to give the entire instruction, the reasons for that objection being substantially those he advanced earlier.

Appellants' counsel stated: "I understand that." Even at this juncture of the case, the trial court gave no explanation for its denial of the requested instruction. The motion for new trial was denied without any accompanying memorandum.

The record further reflects that immediately prior to final arguments, but this time in the presence of the jury, the trial court stated:

We have a standard instruction that refers to the rulings of law in which the judge always says that if counsel refer to a ruling of law that differs from what the Court ultimately gives you, you would rely only on the statements of the Court. In this instance I doubt very much that that would be a relevant observation. I don't anticipate such.

It was reasonable for appellants' counsel to conclude from the discussions in chambers on Friday, October 26 and on Monday, October 29, that he was not free to argue the evidence from the perspective of the honest error of judgment rule. Thus, reversible error occurred—tainting the entire verdict.

Appellants also claim error with respect to the admission of certain expert testimony. Expert testimony is covered by Article 7 of the Minnesota Rules of Evidence. At the new trial the trial court should evaluate the qualifications of any expert witness in light of the rules in Article 7 and the cases applicable thereto.

Appellants also assert the evidence was insufficient to support a finding of negligence or to support a finding of obstetrical causation of the child's brain damage. These issues were close questions. After carefully reviewing the record, we conclude that this case is essentially one for jury determination, provided full and proper instructions, including the honest error in judgment rule, are given to the jury. In *Gamradt v. DuBois*, 180 Minn. 273, 230 N.W. 774 (1930), a medical malpractice case, the Minnesota Supreme Court upheld a jury verdict finding of causal negligence, noting that: "The charge * * is concise, clear and adequately indicates that error of judgment in diagnosis or treatment by a physician is not to be considered as negligence * * *." *Id.* at 276, 230 N.W. at 775.

### DECISION

The omission of the "honest error in judgment" language from the jury instructions on the standard of care was reversible error.

Reversed and remanded for new trial on all issues.

FORSBERG, Judge, dissenting:

I respectfully dissent. The trial court's instruction is sufficient to state the standard of care applicable to physicians. I have found no cases holding that failure to give the "honest error of judgment instruction" is reversible error. In *Sanders v. Boulevard Del., Inc.*, 277 Minn. 199, 203, 152 N.W.2d 132, 135 (1967), the court held that it is not error to refuse to give a negative instruction. The "honest error"

of judgment instruction is unquestionably a negative one.

I would affirm the trial court.

PARKER, Judge (dissenting).

I join Judge Forsberg in his dissent. I would not make mandatory an instruction, approved as permissive, which so deviates from the principles of negligence law. To excuse from liability acts which would otherwise be negligent because those acts were in furtherance of an "honest error in judgment" would excuse a vast array of tortfeasors if applied across the board. Most vehicle drivers found liable for negligence have committed mere "honest errors of judgment," such as misjudging the speed of an oncoming vehicle or the light patterns of a semaphore.

The question is, why is such an excuse, when asserted in defense of professional negligence, given such an exalted status as to be a required instruction to the jury? The answer seems to me to be that this court today requires that something more than mere negligence be shown before a jury will be allowed to find professional negligence. If that is to be the law, that practitioners are to be accorded special protection from suits charging professional negligence, it should be the legislature's province, and the court's function should be limited to seeing that equal protection of the laws is observed.

NIERENGARTEN, Judge, dissenting:

I respectfully dissent. Defendant was not as handicapped as the majority suggests. He was free to argue that in choosing one treatment over the other, the physician was using that "degree of skill and learning" which is normally possessed and used by physicians and, if he so does, cannot be blamed for a bad result.

The "honest error of judgment" instruction should be deleted from JIG II, 425 G–S. It invites a jury to conclude that a physician must commit a "dishonest error" or, by inference, a "bad faith error" before he is liable for negligent conduct. Negli-

gence has never been predicated on honest or dishonest behavior.